UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MOSSACK FONSECA & CO., S.A, BUFETE | : | CIVIL ACTION NO: |
| MF & CO., JÜRGEN MOSSACK and | : | |
| RAMÓN FONSECA | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| NETLIX INC. | : | |
| Defendant | : | OCTOBER 14, 2019 |

## MEMORANDUM OF LAW SUPPORTING REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs (hereinafter "**MFGROUP**") bring this action for damages and injunctive relief against Defendant Netflix, for Defamation, (Libel and Libel Per Se), False Light Invasion of Privacy, Trademark Infringement by Dilution, and Federal False Advertising. Based on the following Memorandum of Law, Plaintiffs' Verified Complaint, and the Affidavit of Arthur Ventura Jr. (attached hereto as Exhibit 1), the Plaintiffs request injunctive relief in the manner set forth hereinafter.

### I.  FACTUAL BACKGROUND

In its movie "The Laundromat," the Defendant defames and portrays the Plaintiffs as ruthless uncaring lawyers who are involved in money laundering, tax evasion, bribery and/or other criminal conduct. Academy award winner Gary Oldman plays Plaintiff, **JÜRGEN MOSSACK**, whose real name is used in the film.  Antonio Banderas plays Plaintiff, **RAMÓN FONSECA**, whose real name is also used in the film.  In the movie's trailer, https://www.youtube.com/watch?v=wuBRcfe4bSo, the opening clips state the movie is "based on some real shit" and several screens appear asking the question "how do 15 million

millionaires in 200 countries stay rich . . . [answer] with lawyers like these," followed by a screen shot of Oldman and Banderas laughing sinisterly, dressed in flashy clothing.

Famous academy award winning actress Meryl Streep, playing recently widowed Ellen Martin who lost her beloved husband on a fall boat tour, pursues justice after being told by her lawyer that her *de minimus* settlement with the responsible tour operator was related to a recent change in the operator's insurance company.  Essentially, the new offshore insurance company was defunct, if it ever existed, and Streep's lawyer states "so there is confusion over who has to pay."  The trailer, designed to attract future moviegoers and boost sales, follows this comment with Streep responding to the lawyer: "so they drown you and 20 twenty other innocent people," and another background voice adds "and somebody's making money off it."  The dialogue spans clips of Streep mourning at a funeral, then reverts back to her lawyer's office where she is given the settlement check and told by her lawyer:  "and it all goes back to this law firm Mossack Fonseca." (hereinafter "**MF**") In an immediately subsequent clip Oldman and Banderas, dressed in flamboyant gold colored suits and sporting bowties, smile and look at one another while elderly people appear to be playing table games at a flashy nightclub casino in background scenes.

The viewer quickly learns that **MOSSACK** and **FONSECA** partners at **MF**, are villains profiting from the death of 20 people killed in the small town boat tour, as the lawyer states "they're getting away with murder."  The imputed criminal conduct is supplemented seconds later when the **FONSECA** character asks the audience:  "So how does it all work?"  In the immediately following clip depicting Streep and her daughter pushing a cart in a grocery store, the answer is provided as Streep exclaims:  "bribery, corruption, money laundering, millions and millions and millions of dollars," while another clip shifts to a download of hacked "Panama

papers" revealing progress at "508, 905" of "11, 528, 218."  The files being downloaded are the notorious 11.5 million hacked documents imparted to a German reporter who enlisted the International Consortium of Investigative Journalists (ICIJ) to unleash the stolen data, worldwide, in articles and other media accounts of politicians, criminals, and other wealthy people using offshore companies to hide assets and launder money.

The "download" frames are followed by a statement echoing one message of the film: "somebody needs to sound the alarm," whereupon Banderas is bombarded with ringing and beeping of multiple phones.  Immediately thereafter clips of people connected to **MFGROUP** offshore accounts and/or purported clients exclaim "shit" and/or other expletives in different languages, including an English speaking lady at a bar, a gentlemen dressed in garb resembling a Sheik, two Russian gangsters, and the wife a Chinese politician driving by some soldiers (hereinafter the "culprits").  The viewer is meant to associate **MOSSACK** and **FONSECA** with these tax evading, money laundering, and otherwise criminal "culprits."  The shock of the actors in these scenes links the culprits with **MFGROUP** as the immediately subsequent scenes depict Oldman and Banderas staring at one another in the **MFGROUP** boardroom reciprocating expressions of complete astonishment.  The clear implication is that all of these people are associated with criminal activity, and they have been "outed" in the "hack and release" of **MFGROUP's** client information.  As the scene returns, it depicts Oldman and Banderas in a Board Room in front of a huge shot of the law firm's logo, which includes the names of Plaintiffs **MOSSACK** and **FONSECA**.  The implications and innuendo converge to cast Plaintiffs in the light of mastermind criminals involved in murder, bribery, money laundering and/or corruption.  The movie's message is clear, and not merely subsidiary;  namely, that **MFGROUP** are money laundering and tax evading criminals.

Recent movie reviews support the Plaintiffs' claims.[1]  Attributing criminal conduct to **MFGROUP** after reviewing the movie, the BBC (on the lighter side of reviews) states the movie is "a light larky skim over 'the subject,' that . . . might cause viewers tutting and chuckling over Mossack Fonseca's <u>crimes</u> and <u>misdemeanours</u>, [but] it won't have them rushing to the barricades. <u>See</u> http://www.bbc.com/culture/story/20190902-film-review-venices-biggest-disappointment (emphasis added).  The Panama Papers, states deadline.com, "came to light due to a whistleblower with knowledge of the Mossack Fonseca law firm.  Schwimmer plays Matthew Quirk, an attorney who speaks on behalf of one of the insurance companies after 20 elderly passengers die on a boating excursion. The boating company learned its insurance isn't the large company it thought it was, but merely just a P.O. box in Nevis  . . .  the incident triggers lawyers, government officials, and more to track down these shell companies. Those investigations lead to the <u>laundering</u> <u>geniuses</u> at the Panama-based law firm Mossack Fonseca." <u>See</u> https://deadline.com/2018/10/netflix-the-laundromat-robert-patrick-steven-soderbergh-1202486204/ (emphasis added).   Indiewire.com continues:  "[t]he 11.5 million documents showcased global tax evasion by thousands of companies registered with Mossack Fonseca, covering up an astounding list of criminal activities . . . "The Laundromat" grows far more intriguing when it settles into a series of overlapping dramas to illustrate the sheer <u>international</u> <u>scale</u> <u>of</u> <u>Mossack</u> <u>Fonseca's</u> <u>corruption</u>.  See https://www.indiewire.com/2019/09/the-laundromat-review-steven-soderbergh-1202170171/ (emphasis added).  And the L.A. Times, confirming the innuendo and the movie's false light portrayal of **MFGROUP** states:  "Mossack Fonseca, a Panamanian law firm whose <u>money-laundering</u> <u>operations</u> were found to have provided <u>cover</u> <u>for</u> <u>all</u> <u>manner</u> <u>of</u> <u>criminal</u> <u>activities</u> <u>worldwide</u>.  In a movie with more than a few

---

[1] <u>See</u> <u>generally</u>, Verified Complaint, ¶¶ 109-118 .

false aliases, it spoils nothing to point out that Banderas and Oldman are in fact playing the firm's chief partners, Ramón Fonseca and Jürgen Mossack (which partly explains Oldman's comically exaggerated German accent).  See  https://www.latimes.com/entertainment-arts/movies/story/2019-09-25/the-laundromat-review-netflix-meryl-streep (emphasis added). Uncontestably, **NETFLIX's** trailer and movie have clearly defamed the Plaintiffs and cast them in the false light of criminality before a substantial number of community members.  The Plaintiffs seeks to enjoin **NETFLIX** from continuing to defame them via publication of false statements and innuendo in "The Laundromat."

In a similar manner, **NETFLIX** defames and tarnishes **MFSA's** logo(s).  In the movie, the imputed crimes and criminality attributed to **MOSSACK** and **FONSECA** become synonymous with the **MFSA** logo.  **NETFLIX** uses the Plaintiffs' already public, famous and/or well known trademarked logo in disparaging ways, placing it strategically in scenes that support false claims and criminal innuendo.  Notably, the **NETFLIX** trailer and movie utilize a "trademarked" logo that is registered in Colombia and protected under the 1929 General Inter-American Convention for Trade Mark and Commercial Protection. The Defendant's use and display of the logo in "The Laundromat," greatly diminishes and/or dilutes its value and goodwill.  The logo is used unnecessarily, placed in scenes that allow viewers to associate it with very serious criminal and unethical behavior.  As such, the Defendant infringes upon the protected logo, disparaging and tarnishing the same for no necessary or colorable artistic purpose and/or constitutional benefit of expression.  The logo is used approximately 8 times between **NETFLIX's** trailer and the movie proper, exposed on the side of a building, on a client folder, twice behind a transparent door in an office, on a background re-broadcast of a CNN news

segment, and three times in scene backgrounds projected on large screen televisions, including one instance in the "we've been outed" scene lasting approximately 30 seconds.

**NETFLIX** uses the logo in both its trailer that is designed to attract moviegoers and generate revenue, and in the movie to benefit economically from the reality the logo lends to its scenes. Clearly, the use is not incidental. When viewing the logo placement in both the trailer and the movie, the viewer will assume that the Plaintiffs endorse and/or approve of the logo's use, however, the manner in which the logo is used would cause most viewers a mental association that would be unsavory, damaging, and/or unwelcomed by the Plaintiff owners of the logo. Accordingly, the defendant has diluted and falsely advertised the logo.

## II.  STANDARDS FOR TEMPORARY RESTRAINING ORDER

Rule 65(b) of the Federal Rules of Civil Procedure establishes the standards for granting a temporary restraining order (hereinafter "TRO"), stating:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

The rule provides that a TRO may be granted ex parte only if  "it clearly appears from specific facts shown" that irreparable harm will be suffered before a hearing can be held. The restrictions on the availability of ex parte TROs imposed by Rule 65(b) are "stringent."   See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 438-39 (1974).  A court must have strong evidence of threatened irreparable injury, and the relief sought must be tailored in a way that is no more intrusive than is reasonably necessary to preserve the status quo until a hearing can be held. Id. at 439.  In

Warner Bros., Inc. v. Dae Rim Trading, Inc., 877 F. 2d 1120, 1124 (2nd Cir. 1989), the court recognized that a TRO should be granted where it would preserve the status quo and prevent irreparable harm, at least until the Court can hold a hearing.  But while a straightforward reading of Rule 65 appears to require a showing of irreparable harm and certification of notice efforts alone, Courts interpret the rule to require more.

For example, the Second Circuit applies the same standards for temporary restraining orders and preliminary injunctions, "and district courts have assumed them to be the same."  See e.g., Allied Office Supplies, Inc. v. Lewandowski, 261 F. Supp. 107, 108 n.2 (D. Conn. 2005). See also Foley v. State Elections Enforcement Comm'n, No. 3:10CV1091 (SRU) (D. Conn. July 16, 2010), 2010 WL 2836722 at *3 (quoting Allied); and also Fairfield County Medical Assoc., v United Healthcare of New England, 985 F.Supp.2d 262 (D. Conn. 2013).  Essentially, granting a TRO or "a preliminary injunction is appropriate if a litigant demonstrates: "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor."  Id. at 270 (quoting Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 149 (2d Cir.1999); Mullins v. City of N.Y., 626 F.3d 47, 52–53 (2d Cir. 2010); Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir.2005).  Where the irreparable harm prong can be demonstrated, but  "likelihood of success" is not provable, a plaintiff may be entitled to such relief if she can demonstrate its alternative:  namely, "sufficiently serious questions going to the merits to make them a fair ground for litigation, as well as a balance of hardships tipping decidedly in favor of the movant."  Id.  In the case at bar, the Plaintiff claims a showing based on the "irreparable harm" prong and a "likelihood of success on the merits."

### III.  IRREPARABLE HARM

In Warner Bros., Inc. v. Dae Rim Trading, Inc., 877 F. 2d 1120, 1124 (2nd Cir. 1989), the

court recognized that temporary restraining orders should issue where the effect would be the

preservation of the status quo, and the prevention of irreparable harm, until the court has had an

opportunity to hold a hearing.  "Irreparable harm is injury that is neither remote nor speculative,

but actual and imminent and that cannot be remedied by an award of monetary damages."

See Rodriguez v. DeBuono, 162 F.3d 56, 61 (2d Cir. 1998) (internal quotation marks omitted)

(discussed in context of preliminary injunction requirements).  Notably, a court will presume that

a movant has established irreparable harm in the absence of injunctive relief if the movant's

claim involves the alleged deprivation of a constitutional right.  See Mitchell v. Cuomo, 748 F.2d

804, 806 (2d Cir. 1984) (noting that if a constitutional right is involved most courts hold that no

further showing of irreparable injury is necessary) (quoting 11 C. Wright & A. Miller, Federal

Practice and Procedure, § 2948, at 440 (1973)).  Similarly, in Heublein v. F.T.C., 539 F. Supp.

123 (D. Conn. 1982), the Court noted that violations of federal law satisfy, per se, the equitable

requirement that Plaintiff demonstrate irreparable harm.  Also noteworthy, is that "courts have

found that "irreparable harm may exist when the moving party could suffer a loss of goodwill,

suffer reputational harm, face exclusion from certain business opportunities, or face a significant

threat to that party's business."  See Fairfield County Medical Assoc., supra at 271-272 (citing

Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970) (threat to business),

Rogers Group, Inc. v. City of Fayetteville, Ark., 629 F.3d 784 (8th Cir.2010) (loss of

goodwill); Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149 (10th

Cir.2001) (loss of reputation and business opportunity), Valley v. Rapides Parish Sch. Bd., 118

F.3d 1047 (5th Cir.1997) (loss of reputation), Multi–Channel TV Cable Co. v. Charlottesville

Quality Cable Operating Co., 22 F.3d 546 (4th Cir.1994) (permanent loss of customers due to the loss of goodwill), and Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861, 867 (8th Cir.1977) (same)).  And while "a showing that irreparable injury will be suffered before a decision on the merits may be reached is insufficient by itself to require the granting of a preliminary injunction, it is nevertheless the most significant condition that must be demonstrated.  See Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir.1985).

Here, there can be no doubt that **MFGROUP** has and will continue to suffer irreparable harm absent the granting of an injunction.  As targets of a Federal Investigation, **JÜRGEN MOSSACK** and **RAMÓN FONSECA** may be brought to Trial in the United States.[2]  This is not merely a speculative claim;  people that once worked with **MOSSACK and FONSECA** (hereinafter "**MF**"), have already been charged in an Indictment in the Southern District of New York.  Noteworthy is the fact that the Indictment specifically names Ramses Owens Saad (hereinafter "Owens") and others along with "associated entities," stating that the identifiable defendants "conspired with each other, and with others known and unknown."[3]  The Indictment not only mentions **MF**, it also includes **MF** in allegations such as (1) **MF** had clients or created companies or "sham companies" that were being advised illegally and serviced by the Owens defendant(s), or (2) **MF** was involved in moving money in the context of the conspiracy alleged by the Government.[4]  While **MF** would certainly contest such claims, clearly the U.S. Attorney's office takes a position on the subject of **MF's** involvement in a conspiracy that has already been

---

[2] See Ventura Affidavit ¶¶ 26-27.
[3] See generally, U.S.A. v Ramses Owen et. al., 18 Crim-693 (S.D.N.Y.), Title to Introduction and ¶ 14.
[4] Id. at Paragraph 29 (alleging in part that "Mossack Fonseca had moved Client-l's money to Switzerland from Hong Kong.");  see also, Ventura Affidavit ¶ 25.

charged against Owens and others.[5] ¶¶ 26-27 (hereinafter "Ventura Affidavit").  The Federal

Indictment against Owens, of course, charges Money Laundering and Conspiracy to Commit Tax

Evasion against the backdrop of shell corporation creation and offshore account holdings.

**NETFLIX's** movie falsely represents that **MFGROUP** was committing the exact same crimes,

utilizing means including those cited by the Government in the Owens Indictment.  In fact, it is

difficult to deny the entire false message of the movie is, undeclared and/or criminal money

sources are being hidden and laundered in tax haven countries where transparency is all but non-

existent, using phony companies that all go "back to this law firm Mossack Fonseca."

In the event that **MFGROUP** Plaintiff is indicted in the United States, it is clearly

uncontestable they would be entitled to Due Process of Law and a full panoply of civil rights

including, but not limited to, the right to a trial by jury.  The widespread false message being

published by **NETFLIX** to audiences everywhere in the United States and around the world,

threatens not only to pollute the "Court of Public Opinion" (for which the Plaintiffs are entitled

to a separate cognizable remedy), but also to pollute a jury pool in a de facto criminal case.  Any

mildly seasoned criminal trial lawyer realizes the effect of film on the objectivity of jurors, and

in the voir dire process it is common to ask questions about a juror's viewing habits—people

cannot help being affected by what they watch.  In addition, courts invariably acknowledge this,

regularly admonishing jurors to stay away from television and internet surfing during their tenure

in order to maintain their impartiality.  This is significant because the gatekeeper of a jury trial is

there to ensure an impartial jury and a fair untainted verdict based only upon evidence presented

at trial.  Even when admonished, however, not all jurors do or can do as they are asked.  In fact,

the admonishment and/or even "curative instructions" in general, arguably prompt the very thing

---

[5] See Ventura Affidavit at ¶ 27 (stating that Plaintiffs are not only Targets, but also earmarked for incarceration based on the crimes contemplated against them by FBI and HSI).

they strive to avoid.  Occasionally, curative instructions are unwelcomed and argued against as a matter of trial strategy/tactic, for this very reason.

Once the cat is out of the bag, it is impossible to put it back without the consequence of tainting a verdict.  This is especially true where the cat is named "Laundromat" and the charges would include money laundering.  Here, a worldwide audience including potential jurors in a Southern District prosecution, could easily echo the views of influential movie reviewers (which include false accusations and misrepresentations),[6] well before they are ever exposed to real evidence.  This problem is writ even larger when the influences that come to bear upon such minds include the false and defamatory message of famous directors, supplemented by words that roll off the tongues of decorated academy award winning actresses such as Meryl Streep.  The message is hard to forget, however unsubstantiated the claims may be, and this leaves the potential defendant(s) without a viable remedy where Justice is expected most.  This stress upon constitutional rights constitutes irreparable harm in many ways, and the Court has the discretion to prevent it by narrowly tailoring a remedy in advance.

In addition to legal harms in the United States, **NETFLIX's** publication of "The Laundromat" ("La Lavandería" in Spanish) precipitates threatened harms in Panama.  **JÜRGEN MOSSACK** and **RAMÓN FONSECA** have been named as defendants in criminal legal proceedings in Panama, by the Ministerio Publico-Fiscalia Auxiliar, to wit, one case commonly referred to as the "Lava Jato" case (Fiscal/Prosecutors File 06-2016, Court File Panama City 48931-19), and the second commonly referred to as the "Panama Papers" case (Fiscal/Prosecutors File 02-2016, Court File Panama City 87256-19 ).  Both of these cases were launched notitita criminis, a procedural norm that is enshrined in the Panamanian

---

[6] See e.g., Verified Complaint ¶¶ 109 through 117.

criminal/judicial code;  essentially, media about any possible crime that comes to the attention of the prosecuting authorities obligates them to investigate.  As a result of these news driven investigations and cases, **JÜRGEN MOSSACK** and **RAMÓN FONSECA** have already been imprisoned for several months, and have now been confined to the Republic of Panama, with bi-weekly reporting conditions as part of their bail Order.  Additionally, each must continue to post a five-hundred-thousand dollar ($500,000.00) bond for which they incur approximately $22,000.00 in yearly fees.[7]  Based solely upon media accounts actually cited by authorities in official charge-related documents, **JÜRGEN MOSSACK** and **RAMÓN FONSECA,** have been imprisoned and had their liberty restrained in other manners.

NETFLIX's movie "The Laundromat" depicts crimes that are imputed to **JÜRGEN MOSSACK** and **RAMÓN FONSECA**, as well as their law firm **MF** and/or Mossack Fonseca & Co., S.A. (hereinafter"**MFSA**").  These crimes are unrelated to the charges they face currently in Panama.  Thus, while the Plaintiffs have no connection, for example, to Cartel murders or Russian-gangster money laundering, an investigation into allegations made directly and/or via innuendo in the movie, will subject Plaintiffs to unnecessary and unwanted official legal attention, including separate investigations.  These threatened media based harms are identical to ones that have already precipitated incarceration and restraints upon the liberty of **JÜRGEN MOSSACK** and **RAMÓN FONSECA**.  Since media reports have previously resulted in their incarceration and the imposition of restrictive bail conditions, there is no reason to discount such a threatened harm currently upon widespread publication of a movie accusing the pair of other crimes.  Thus, these threatened harms are not merely speculative, they have occurred previously based upon less notorious media.

---

[7] See, generally, Ventura Affidavit supra, ¶ 25.

At this juncture, while the movie does not appear to have been released to a wide general public "in theatres" (only at two film festivals), **NETFLIX** is poised to stream its movie to millions of subscribers around the world beginning on October 18, 2019, under the titles "The Laundromat," as well as the "Lavandaria."  Preparations are confirmed for introduction into the Spanish speaking market, including the country of Panama itself, by the promotional poster:



Obviously, the Plaintiffs would prefer to maintain the status quo, with the film not being released to the general public via streaming, especially in Panama and the United States, where they are dealing with criminal legal issues.  Notably, in spite of being the targets of two Panamanian cases for approximately four (4) years, neither the individual Plaintiffs, nor the corporate entities have ever been convicted of any charged crime.[8]  The film is unwelcomed by Plaintiffs, because by October 18, 2019, it will spread false accusations and criminal innuendo to the public, which will surely reach authorities and potential jurors.

In addition to civil rights related harm, it cannot be denied that mere allegations have destroyed **MFGROUP's** business.  Banks outrightly refuse to deal with **MFGROUP,** and their existing client base has been obliterated by a "hack and release" that has and will continue to plague them into the future.  Significantly, the future for **MFGROUP** must not be ignored;  they

---

[8] See Ventura Affidavit ¶ 25.

have a right to face allegations fairly and pick up where they left off before the "hack and release." This is both a continuing and future right and expectation.

Notably, threats to business reputation and loss of goodwill have been recognized by Courts as irreparable harms. See, generally, Fairfield County Medical Assoc., supra. Here, while one may claim that goodwill and business reputation have already been harmed by the "hack and release," future interests and opportunities are no less worthy of protection. Loss of reputational interests and goodwill based upon allegations of criminal activity are obvious here. However, even where goodwill has been damaged in the past, the owners of the same are entitled to protect against complete obliteration and/or salvage what might remain. Permanent loss of clientele occasioned by damage to goodwill, is something **MFGROUP** is entitled to guard against. See Fairfield County Medical Assoc., supra (citing Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546 (4th Cir.1994) (citing protection against permanent loss of customers due to the loss of goodwill) (emphasis added), and Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action, 558 F.2d 861, 867 (8th Cir.1977) (same)). Thus, the Plaintiffs have interests not only in preventing loss of customers, but "permanent" loss of customers due to loss of goodwill. On the heels of an acquittal or if allegations are otherwise shown to be false in future, **MFGROUP** would certainly be entitled to "pick up the pieces," based upon the truth having come to light. To rebuild, or try to regain the goodwill that was generated over four decades of work, would be an already difficult endeavor; to be sure, the message of **NETFLIX's** movie places unnecessary and unwarranted burdens upon **MFGROUP's** future business opportunities and ability to prevent permanent loss of goodwill and clientele.

The civil rights, reputational, and liberty interests at stake, clearly require an injunctive remedy, since appurtenant harm cannot be remedied simply by money damages.  The complete obliteration of a business reputation, and loss of clients occasioned by the loss of goodwill, cannot be compensated by money either;  the ability to "pick up the pieces" of a business destroyed by false accusations of criminal conduct would be incredibly difficult to monetize and assign calculable damages.  Thus, the Plaintiffs can demonstrate irreparable harm that cannot be remedied by money compensation alone.

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

Generally, likelihood of success requires the Court to conduct an assessment of the strength of the movant's claims.  The Court is not required to decide the Plaintiffs' case completely at this stage, and there is no rule requiring that the movant prove her case on a preponderance of the evidence standard.  Notably, where the injunctive relief sought is mandatory (e.g. requiring a defendant to do a positive act) versus prohibitive (e.g. maintaining status quo),  "in addition to demonstrating irreparable harm, '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits."  See D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 510 (2d Cir.2006) (citations omitted).

Additionally, when injunctive relief is requested in the context of a non-movant's speech, the burden of persuasion is even greater because prior restraints on expression are "the most serious and the least tolerable infringement on First Amendment rights."  See Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union, 239 F.3d 172, 176 (2d Cir. 2001) (quoting Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976)).  But while the Second Circuit subscribes to the "majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases, " there is no bright line rule

prohibiting injunctive relief in all such situations.  See, e.g., Peregrine Myanmar Ltd. v. Segal, 89 F .3d 41, 52 (2d Cir.1996) (noting that where complaint included claims that defendant had interfered in plaintiff's business by making false and misleading statements to plaintiff's customers, some aspects of an injunction were appropriate);  see also Bingham v. Struve, 184 A.D.2d 85, 591 N.Y.S.2d 156 (1st Dep't 1992) (stating that where all the elements for preliminary injunctive relief were demonstrated, such relief based on a claim of libel was appropriate).  Further, "narrowly crafted injunctions may be appropriate with regard to a defendant's unprotected speech.  See Ferri v. Berkowitz, 561 Fed.Appx. 64, 65 n.2 (2d Cir. 2014).   And ultimately, speech including certain defamation and fraud "bring the speech outside the First Amendment . . . [where] the statement must be a knowing and reckless falsehood."  See United States v. Alvarez, 567 U.S. 709 (2012).

Here, the Plaintiffs can demonstrate likelihood of success on the merits, on both the prohibitive and mandatory injunctive standards, and the relief requested pertains to unprotected speech that this Court could abate with a narrowly tailored preliminary injunction.

**i.  Libel and Libel *Per Se***

Defamation includes libel and slander: slander is oral defamation and libel is written defamation.  See Mercer v. Cosley, 110 Conn. App. 283, 297 (Conn. App. Ct. 2008).  A defamatory statement under Connecticut law is one that has a tendency to harm another's reputation and/or "lower him in the estimation of the community or to deter third persons from associating or dealing with him."  See Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 627 (Conn. 2009).  Establishing a prima facie case requires the Plaintiff to demonstrate that: "(1) the defendant published a defamatory statement;  (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4)

the plaintiff's reputation suffered injury as a result of the statement." Id. at 627-28.  As to the first element, a defamatory statement is defined as "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Id. at 627.  To establish an actionable statement it must be false.  See Cwelinsky v. Mobil Chemical Co., 267 Conn. 210, 228–29 (Conn. 2004).  Each time the false statement is published a new cause of action arises.  Id. at 217.  Where the Defendant is a "public figure," the Plaintiff must show that the statement was published with "actual malice, such that the statement, when made, was made with actual knowledge that it was false or with reckless disregard of whether it was false." Gambardella, supra at 628 (internal quotation marks and citations omitted).  The supporting evidence must demonstrate "purposeful [versus negligent] avoidance of the truth." See Hopkins v. O'Connor, 282 Conn. 821, 846 (Conn. 2007) (citations omitted).  Notably, punitive damages are recoverable only if a Plaintiff proves malice, irrespective of the public figure/private citizen distinction.  Gambardella supra at 628.

Here, the Plaintiffs claim libel per se, in addition to simple libel. "In general, there are two classes of libel that are actionable per se: (1) libels charging crimes and (2) libels which injure a man in his profession and calling." See Gambardella v. Apple Health Care, Inc., 86 Conn. App. 842, 850 (Conn. App. Ct. 2005).  Here, both classes are operative.  The "per se" determination is a question of law decided by a Court.  Id. at 850.   Libel per se "charges a crime which involves moral turpitude or to which an infamous penalty is attached;  namely a "chargeable offense which is punishable by imprisonment." See Battista v. United Illuminating Co., 10 Conn. App. 486, 493 (Conn. App. Ct. 1987).  Where libel per se is proven, "injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it. See Spears v. Elder, 124 Conn. App. 280, 289 n.6 (Conn. App. Ct. 2010).  In such a case the

Plaintiff can recover general damages for reputational injury as well as for "the humiliation and mental suffering which the [defamatory statements] caused . . .. " See DeVito v. Schwartz, 66 Conn. App. 228, 235 (Conn. App. Ct. 2001). In the case of libel per se "the jury may award the plaintiff general damages without any further proof thereof, special damages if proven and punitive damages as a matter of discretion." Id.

Truth is an absolute defense to an allegation of defamation. See, e.g., Goodrich v. Waterbury Republican-Am., Inc., 188 Conn. 107, 112 (Conn.1982); Thibodeau v. Am. Baptist Churches of Conn., 120 Conn. App. 666, 678-79 (Conn. App. Ct. 2010) ("Truth is a defense to defamation."). But while "truth is an affirmative defense to defamation … the determination of the truthfulness of a statement is a question of fact for the jury. As a defense, truth provides protection against liability, but not against the expense and inconvenience of being sued." Cweklinsky, supra at 228-29. Moreover, a defendant need not establish the literal truth of the allegedly defamatory statement: "[w]here the main charge, or gist, of the libel is true, minor errors that do not change a reader's perception of the statement do not make the statement actionable." See Strada v. Connecticut Newspapers, Inc., 193 Conn. 313, 322 (Conn. 1984) (internal quotation marks and citation omitted); see also Woodcock v. Journal Pub. Co., Inc., 230 Conn. 525, 554 (Conn. 1994) ("A defendant will not be held liable as long as the statements at issue are substantially true"). "The issue is whether the libel . . . as published, would have a different effect on the reader [or listener] than the pleaded truth would have produced." Goodrich, surpra at 113.

While the Plaintiffs assert there is no truth to representations made by **NETFLIX** in "The Laundromat," that they are criminals and have committed crimes such as money laundering and tax evasion, libel in the case at bar is also claimed in the form of innuendo and implication.

"Innuendo or inference may result merely from the tone or "slant" of an article, or innuendo or inference may also result from the failure to present the whole picture.  See Memphis Publishing Co. v. Nichols, 569 S.W.2d 412 (Tenn.1978).  In Memphis Publishing, for example, a newspaper reported that a woman, upon arriving at the home of another woman,  "first fired a shot at her husband and then at [the other woman], striking her in the arm."  Id. at 414.   What the article failed to state, however, was that other neighbors and the other woman's husband were also there, and the shooting was an accident.  While the published statements were true as a technical matter, they falsely implied a scorned woman's rage precipitated the shooting because she came upon her husband and another woman in an adulterous affair.  Thus, while it is axiomatic that truth constitutes a defense to defamation, in certain circumstances even true statements can converge and be construed to contain a false and defamatory meaning by implication or innuendo.  Likewise, where a publication implies a falsehood by omitting or "strategically juxtaposing key facts," the same may constitute a cause of action even where all individual statements taken in isolation may be true.  See, e.g., Strada v. Conn. Newspapers, Inc., 193 Conn. 313, 322–23, 477 A.2d 1005 (1984).

NETFILX's movie "The Laundromat" publishes harmful falsehoods to third parties constituting a substantial portion of the community, including past and future clients and/or others with whom Plaintiffs will seek to mend failed relations caused by false accusations of criminal conduct.  The message and the title of the movie clearly imply that the Plaintiffs (identified by name) are criminals involved in money laundering and tax evasion conspiracies.  Importantly, however, NETFLIX leaves out the material fact that crimes attributable to the Plaintiffs in the movie completely ignore the original client/end user distinction.  Namely, NETFLIX attributes such crimes to MFGROUP by conveniently ignoring the fact that creation

of a corporation or business entity that is sold to an initial client, such as a bank, or accounting firm, does not magically transform every "end user" into an **MFGROUP** "client."  Ignoring this distinction, and the fact that **MFGROUP** conducted due diligence (having had its own compliance group at one point)[9] wherever a "know your client" law required the same, permits the false inference that **MFGROUP** participated in the crimes of those "end users" who never purchased companies from nor ever even met with **MFGROUP**.  The magic makes for a great story, to be sure, but the innuendo created is destructive and unfair to **MFGROUP**—it is a money-maker for **NETFLIX** but an irreparably harmful money-loser for the Plaintiffs.

In addition, the movie preview strategically juxtaposes scenes to defame **MFGROUP**. For example, Streep saying:  "so they drown you and 20 twenty other innocent people," and another background voice adds "and somebody's making money off it . . . and it all goes back to this law firm Mossack Fonseca."  And then after alleging it "all goes back to Mossack and Fonseca," clips citing crimes such as ""bribery, corruption, money laundering, millions and millions and millions of dollars," then shifting to a download of hacked "Panama papers" revealing progress at "508, 905" of "11, 528, 218," all converge to produce the clear message that Mossack and Fonseca are criminals, and that the Panama Papers "hack and release" revealed as much.  The defamatory impression created via false statements and innuendo is echoed by movie-reviewers, many of whom saw the movie and concluded themselves that **MFGROUP** were engaged in criminal conduct—for example, they were "money laundering geniuses."  See generally, Verified Complaint, ¶¶ 109 to 117.  The crimes attributable to **MFGROUP** are ones of moral turpitude and would subject them to imprisonment, and therefore, constitute libel per se.

---

[9] Ventura Affidavit ¶ 23.

In defaming the individual plaintiffs, the movie defames their business entities as well. Consequently, the reputational interests of both partners as well as the goodwill and reputation of the Mossack Fonseca law firm are implicated and damaged.  See generally, discussion herein, supra, sec. III entitled "Irreparable Harm."  Defendant can demonstrate a strong likelihood of success on the merits, based on the nature and pervasiveness of **NETFLIX's** libel, and the fact that no defense of truth can be asserted in defense.  See generally, discussion herein, supra, sec. IV entitled "Likelihood of Success."  In addition, **MFGROUP** are not "public figures," since they have not voluntarily placed themselves or their reputational interests before the public. They are classically forced into the vortex of public controversy involuntarily after the "hack and release" of confidential and privileged material, and two resultant criminal charges in Panama. Notably, the Supreme Court has rejected the contention "that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction."  See Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 168 (1979).  While some litigants may actually be "public figures,"

> either generally or for the limited purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom . . . [t]o hold otherwise would create an 'open season' for all who sought to defame persons convicted of a crime.

Id. at 168-69.  Lastly, the criminal accusations made and/or implied in **NETFLIX's** movie would not constitute "protected speech," therefore, the Plaintiffs are entitled to narrowly tailored injunctive relief rooted in both libel and libel per se, as set forth in the Verified Complaint and supplemented by the Ventura Affidavit

### ii  False Light Invasion of Privacy

A claim for false light requires that the defendant give publicity to a matter concerning plaintiff that places the plaintiff before the public in a false light.  See Cayo v Shop and Stop Supermarkets, 2012 WL 5818862 (citing Goodrich v. Waterbury Republican–American, Inc., 188 Conn. 107, 131, 448 A.2d 1317 (1982).  As adopted by Connecticut Courts, the Restatement defines a false light invasion of privacy as follows:

> [o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

In the context of false light invasion of privacy, publication means communicating a matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.  See, Holmes v Town of East Lyme, 866 F. Supp. 2d 108, 131 (D. Conn. 2012).  Here, it is indisputable that **NETFLIX** has communicated and prepared its movie "The Laundromat," as well as its trailer, in a manner that is certain to become one of public knowledge.  Moreover, after (1) airing the film at two film festivals (Venice and Toronto between August and September 2019, (2) scheduling limited release of the movie in theatres on September 27, 2019 (which may not as yet occurred), (3) having streamed the preview on Youtube exposing it to 1,406,891 hits,[10] and (4) having prepared it for streaming into the homes of millions of viewers on October 18, 2019, it is clear that "the matter must be regarded as substantially certain to become one of public knowledge."  Id.  Lastly, and most obviously, accusing a person of committing a crime such as money laundering and/or other felonious crimes

---

[10] See, https://www.youtube.com/watch?v=wuBRcfe4bSo

without regard to the effect such crimes have upon others is  "highly offensive," and this element is hardly disputable.

With respect to whether **NETFLIX** knew, or acted in reckless disregard of the false light within which they portrayed the defendant, the development of the film is instructive.  The film is based on the novel "Secrecy World" by Jack Bernstein, a Pulitzer Prize winning author.  As a journalist of such caliber, and having been one of the ICIJ journalists who worked with the "hack and release" material distributed by Obermayer, he knew the difference between an "original client" and "end user:"  As confirmed by his book, he was well aware of the fact that **MFGROUP** sold companies to professionals such as Banks and Accounting firms.  As a consultant and/or Executive Producer of "The Laundromat," acting on behalf of **NETFLIX**, its servants, employees and/or other representatives, he clearly had the relevant background to know the falsity of the message, that notorious criminals who were "outed" after the hack were not **MFGROUP** clients.  Almost certainly, a writer of his caliber recognized the convenience of blurring the distinction between clients and ultimate end users who were involved in criminal activity unrelated to **MFGROUP**.  It would be difficult to imagine that these distinctions and other relevant facts were not shared with **NETFLIX** prior to the time the movie was completed, or even during its creation, when clearly Mr. Bernstein knew the difference—he didn't just forget the distinction when he commenced work with **NETFLIX**.  And clearly Mr. Bernstein was poised uniquely to assess the false representations and/or innuendo that flowed from the film while working as an agent, representative and/or employee of **NETFLIX.**

Further, Director Steven Soderburgh himself has demonstrated a keen grasp of the offshore company industry, and has admitted to using offshore vehicles himself in the movie and in subsequent interviews.  For example, in a Filmmaker Magazine interview he himself admits

that companies that are created can exist without a nefarious use, and they obviously serve

specific purposes.  In the same interview, in stark contrast to what **NETFLIX's** movie portrays,

Soderburgh states:

> Scott and I were very adamant that they [Jurgen Mossack and Ramon Fonseca] not be
> stock villains, because we felt they as people were more complicated than that and the
> situation itself was more complicated than that. They did not invent these structures. This
> has been going on for a long time. They just figured out a way to do a high-volume
> business in creating these kind of entities.

filmmakermagazine.com/108310-i-think-everything-is-the-directors-fault-ste (emphasis

added).[11]  It is difficult to reconcile these statements by the Director of "The Laundromat" with

the portrayal of **MFGROUP** in the movie.  To claim that **MOSSACK** and **FONSECA** and their

law firm are not villains in the movie is a cataclysmic understatement, which stands in wholly

stark contrast to gist of the movie and the commentary by movie reviewers. The comments made

here are wholly incommensurate with the message of the movie and the grossly obvious

innuendo that unfolds against **MFGROUP** therein.  And, as if this view was contagious only

among insiders at **NETFLIX**, a text message to Jurgen Mossack, by Executive Producer Jack

Bernstein, prior to the trailer and/or movie release states:  "I saw the film recently.  I think you

and Ramon will be very pleased.  You don't come out as the bad guys at all rather it's the system

and the United States that receive the bulk of the blame."[12]  Nothing could be further from the

truth, and it is difficult to imagine any viewer walking away from the movie not remembering

**MOSSACK** and **FONSECA** and their law firm, and how they appear to be at the heart of

criminal activity

Accordingly, **NETFLIX** knew, or ought to have known through basic fact checking of its

own, or through consultation with Bernstein, that the owners of Mossack and Fonseca were not

---

[11] See also, Ventura Affidavit ¶ 29.
[12] Id. at ¶ 30.

criminals, and their businesses were not involved in criminal activity simply because they created companies which their clients ultimately sold to end users who were exposed as criminals.  **NETFLIX** knew of the falsity of their message and innuendo and, in spite of the same, the Plaintiffs' reputations were defamed and they were portrayed in the false light of criminality, in order to attract moviegoers and sell tickets.  Minimally, **NETFLIX** acted in reckless disregard of the false and damaging innuendo "The Laundromat" would generate, all to the detriment of the Plaintiffs' reputational and economic interests.

Since False Light and Defamation are treated similarly with respect to injunctive relief, the previous sections pertaining to irreparable harm, likelihood of success on the merits (including the possibility of applying any heightened standards), and this Memorandum's prior discussion of First Amendment considerations, are all incorporated here.  For all of the foregoing reasons, the Court should grant injunctive relief, including a narrowly tailored Temporary Restraining Order, rooted in Plaintiffs' False Light claim.

### iii.  Injunctive Relief-Trademark Violations; Inter American Convention & Lanham Act.

#### (a) Inter American Convention

**MFSA** owns a registered trademark in Colombia, protected under the 1929 General Inter-American Convention for Trade Mark and Commercial Protection (hereinafter the "Convention).[13]  As a Southern District Court in New York acknowledged: "[t]he Inter-American Convention, is a self-executing treaty, and thus it became law in the United States without the necessity for implementing legislation."  See Havana Club Holding, S.A. v. Galleon,

---

[13]  The logos are registered in the name of Plaintiff Mossack Fonseca & CO, S.A., with the Superintendencia Industria y Comercio, Republic of Colombia, to wit, (1) Expediente No. 10-053693 – Certificado de Registro 412048, (2) Expediente No. 10-053705 – Certificado de Registro 412052, and (3) Expediente No. 10-053702 – Certificado de Registro 412051.

S.A., 62 F. Supp. 2d 1085, 1092 (S.D.N.Y. 1999), cert. denied, Havana Club Holding, S.A. v.

Bacardi & Co., 531 U.S. 918 (2000) (citing Bacardi Corp. of America v. Domenech, 311

U.S.150, 161 (1940)).  The Trade Mark Trial and Appeal Board further noted that while it had

the same force of federal law, it was actually independent of the Lanham Act.  See  British-

American Tobacco Co.Ltd. v. Philip Morris Inc., 55 U.S.P.Q.2d 1585, 2000 WL 1005433

(T.T.A.B. 2000).  Notably, both Colombia (country where the trademark is registered pursuant to

domestic law) and the United States of America are Member States--authorized to pursue

protection and infringement claims using the legal systems in the Member State of the offending

party.

In fact, Article 7 of the 1929 General Inter-American Convention for Trade Mark and

Commercial Protection states in relevant part:

> Any owner of mark protected in one of the Contracting States in accordance with its
> domestic law, who may know that some other person is using . . . an interfering mark in
> any other of the Contracting States, shall have the right to oppose such use  . . .  and shall
> have the right to employ all legal means, procedure or recourse provided in the country in
> which such interfering mark is being used . . .  and upon proof that the person who is
> using such mark . . .  had knowledge of the existence and continuous use in any of the
> Contracting States of the mark on which opposition is based upon goods of the same
> class the opposer may claim for himself the preferential right to use such mark in the
> country where the opposition is made . . . upon compliance with the requirements
> established by the domestic legislation in such country and by this Convention.

Id.  Thus, a showing of (1) ownership and (2) proof that the junior user of the logo (e.g.

**NETFLIX**) knew of the existence and continuous use of the mark in "any" contracting State,

would allow the owner preferential rights of use "in the country," and permit the owner all "legal

means, procedure or recourse" to protect and enforce the same.  **NETLIX** clearly knew that

**MFSA** previously and continuously used of the logo, and that's why it was used in the movie—

the logo made their scenes appear more real to the viewer.  Here, proof would establish the

applicability of injunctive relief spanning the entire country and, presumably, into any other

Member State.[14]  In fact, specific language in the Lanham Act appears to grant Member State

Plaintiffs any rights which are more extensive than U.S. law would otherwise provide.  For

example, Section 44 (b) of the Lanham Act provides:

> Any person whose country of origin is a party to any convention or treaty relating
> to trademarks, trade or commercial names, or the repression of unfair competition,
> to which the United States is also a party, or extends reciprocal rights to nationals
> of the United States by law, shall be entitled to the benefits of this section under
> the conditions expressed herein to the extent necessary to give effect to any
> provision of such convention, treaty or reciprocal law, in addition to the rights to
> which any owner of a mark is otherwise entitled by this chapter.

15 U.S.C. § 1126 (2000) (addressing international conventions and foreign mark registration in

the U.S.).  Notably, the Convention explicitly provides for the remedy of injunctive relief.  In

addition, enforcement of priority rights under the Convention do not require a mark to be

"famous."  Absent a "famousness" requirement, the Convention grants Member State Plaintiffs

more rights to protect their trademarks.  Ultimately, this Court has the jurisdiction to "give

effect" to these provisions and award **MFSA** injunctive relief, upon a showing of ownership and

**NETFLIX's** prior knowledge of the existence and use of **MFSA's** logo in any Member State

country.  Neither of these requirements are problematic based on the fact pattern in the case at

bar.

The **NETFLIX** trailer and movie utilize one or more of **MFSA's** trademarked logos in

"The Laundromat," without authority, permission, or license to use the same.  They are used

approximately 8 times between **NETFLIX's** trailer and "The Laundromat" movie, to wit:

---

[14] 1125(c)(1) of the Lanham Act provides, in relevant part that "the owner of a famous mark . . .
shall be entitled to an injunction . . .," and pursuant to Article 7 of the Convention, an offended
senior trademark holder has "the right to employ all legal means, procedure or recourse provided
in the country in which such interfering mark is being used."  These provisions read together
support the claim that this Court can enjoin **NETFLIX** for the trademark violation claimed here.

      a.  once exposed on the side of a building;
      b.  once on a client folder;
      c.  twice behind a transparent door in an office;
      d.  once on a background re-broadcast of a CNN news segment;
      e.  three times (once for 30 seconds) on background televisions.

Defendant uses the Plaintiffs' already public, famous and/or very well known trademarked logos disparagingly, placing them in scenes that allow viewers to associate the same with serious criminal and unethical behavior.  For example, the 30 second display after the **MOSSACK** and **FONSECA** characters find out that their confidential files have been hacked and released, and they are depicted worrying about the impending exposure of criminal acts of their "movie clients" and their own involvement in the same.  A thirty-second display in one of approximately eight (8) scenes is not merely incidental use.[15]

      **MFGROUP** has expended many thousands of dollars developing its logo, branding its service, and using the logo in the generation of goodwill in its business.  The logo belongs to a very successful and dominant force in the offshore legal-service industry, and has been seen by thousands of people world wide on products, at seminars, and on websites used by the firm.[16] **MFSA** has placed its logo on items used throughout the world in the course of marketing services and developing its brand, including, but not limited to, offices in Latin America, the United Kingdom and the United States.[17]  It is a very well known logo especially in the legal service industry, and it plays a central role in communicating **NETLFLIX's** message that the scheming, laundering and other criminal activity "all goes back to this law firm Mossack and Fonseca."  In short, it would be difficult to reconcile **NETFLIX's** use of such a significant prop,

---

[15] See Ventura Affidavit ¶ 35.
[16] <u>Id.</u> at Ventura Affidavit at ¶ 22.
[17] <u>Id</u>.

if they were unaware of its existence and prior use by it owner **MFSA**.  Its use and associations

in the minds of **MFSA's** consumers is exactly what gives the logo value as a movie prop.

MFSA is the senior user and owner of the mark, and **NETFLIX's** junior use offends its

title and preferential use in the United States and other Member States that are part of the

Convention.[18]  Under Article 7, therefore, **MFSA** has the right to oppose and seek enforcement

of its rights guaranteed by the Convention, which would include the right of injunction against

**NETFLIX's** continued use of the logo in its film "The Laundromat," both in the United States

and in any other Member State.  Accordingly, this Court has jurisdiction and a legal basis to

enjoin **NETFLIX** from using **MFSA's** trademarked logo in its movie and/or promotional

materials anywhere in the United States and/or in any other Member State.

### (b) Trademark Infringement;  Lanham Act-Dilution by Tarnishment

To prevail on a trademark infringement claim for registered trademarks, pursuant

to 15 U.S.C. § 1125(a)(1), **MFSA** must establish that (1) it has a valid mark that is entitled to

protection under the Lanham Act;  and that (2) the defendant used the mark, (3) in commerce, (4)

"in connection with the sale . . . or advertising of goods or services," (5), without the plaintiff's

consent.  See 1-800 Contacts, Inc. v. Whenu.com, Inc. 414 F.3d 400 (2d Cir. 2005).  None of

these elements are disputable.  **MFSA's** logo is protected under the Lanham Act because the Act

incorporates the 1929 General Inter-American Convention for Trade Mark and Commercial

Protection.  Proof of the logo's use is satisfied by **NETFLIX's** display of the same in its movie,

no less than eight (8) times.  The mark was used in commerce in connection with the sale and

advertising of goods, in that it was displayed in a trailer to attract moviegoers.  It was also used

---

[18] The member states include:  "Peru, Bolivia, Paraguay, Ecuador, Uruguay, Dominican Republic, Chile, Panama, Venezuela, Costa Rica, Cuba, Guatemala, Haiti, Colombia, Brazil, Mexico, Nicaragua, Honduras, and the United States of America.

in the movie proper, to enhance the reality of its setting and message.  It has been aired at two

film festivals, and is currently scheduled to be streamed into the homes of millions of **NETFLIX**

subscribers on October 18, 2019.  The logo was previously used exclusively by **MFSA** in

commerce, upon marketing materials, documents, client development gifts, and on website(s)

used by **MFSA**.[19]  Clearly, **NETFLIX** has no permission, license, or other authority to use the

protected mark.

The gravamen of **NETFLIX's** use of the protected logo, is primarily in the negative

association and resultant loss of goodwill and reputational harm occasioned by the unpermitted

use.  This is a legally cognizable claim know as dilution by "tarnishment."  Under §

1125(c)(2)(c) tarnishment is the "association arising from the similarity between a mark or trade

name and a famous mark that harms the reputation of the famous mark."  Id.  As noted by the

Second Circuit:  "The sine qua non of tarnishment is a finding that plaintiffs mark will suffer

negative associations through defendant's use."  See Hormel Foods Corp. v. Jim Henson

Products, Inc., 73 F.3d 497, 507 (2d Cir. 1996).  Expounding on this notion, the Ninth Circuit

has stated that dilution by tarnishment occurs when the mark is linked "with something unsavory

or degrading."  See Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 790, 793 (9th Cir. 1981)

(refusing Plaintiff's tarnishment claim where Sears' use of the "Bagzilla" mark on "Monstrously

Strong" garbage bags failed to tarnish the "Godzilla" mark absent linking the same with

something "unsavory" and/ or "degrading").

When criminal activity, including money laundering, tax evasion, insurance and wire

fraud, and bribery, are being attributed to **MOSSACK** and **FONSECA** in a movie called the

"The Laundromat" or "La Lavandería," it is difficult to deny anything less than an "unsavory,"

---

[19] Ventura Affidavit at ¶ 22.

or "degrading" association with the mark--especially as its being broadcasted behind the partners for 30 seconds in a movie whose message is that these alleged crimes "all go back to this law firm Mossack and Fonseca."  The logo is as much defamed as **MFGROUP**, and viewers are likely to associate the logo not with the existing goodwill generated, but with criminal accusations.

Section 1125(c)(1) of the Lanham Act provides, in relevant part that "the owner of a famous mark . . .  shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  Id.  Since the logo is registered in compliance with the domestic laws of Colombia, a Convention Member State, there can be no dispute over its ownership.  **MFGROUP** has expended many thousands of dollars developing its logo, branding its service, and using the logo, over many years.  It belonged to a very successful and dominant force in the offshore legal-service industry, and has been seen by thousands of people worldwide on products, at seminars, and on the firm's website.[20]  **MFGROUP** has branded items and promotional materials used throughout the world in marketing services and developing its brand, in offices in Latin America, the United Kingdom and the United States.  Thus, it is a famous and well-known mark that has been used by **MFSA** before **NETFLIX's** junior infringing use commenced.  Since the logo is used in the film along with its promotional materials, it has clearly been used in commerce.  Ultimately, **MFSA** is entitled to statutory injunctive relief against the Defendant based upon trademark infringement by dilution under the Lanham Act.

---

[20] Id. ¶ 22

## CONCLUSION

The district court has wide discretion in determining whether to grant a preliminary injunction.  Millions of **NETFLIX** subscribers worldwide will begin to view "The Laundromat," on October 18, 2019.  Notably, the anticipated release date corresponds with times during which the Plaintiffs will be defending criminal charges against them in Panama.  The legal system in Panama obligates prosecutors to investigate what it learns in the media where an accusation of crime appears, under the doctrine of <u>notitita</u> <u>criminis</u>.  Additionally, since both **MOSSACK** and **FONSECA** are the subjects of an FBI Investigation in the Southern District of New York that could result in a trial in the United States, the false "Big Screen" portrayal of their involvement in money laundering and/or other financial crimes poses an immediate threat and harm to the Plaintiffs' fair Trial rights.  The defamatory representations made about Plaintiffs' involvement in crime and unethical behavior, along with the disparaging manner in which the Plaintiffs and their protected logos are portrayed, stands to affect current proceedings against them in Panama, and to pollute a potential jury pool in a U.S. criminal prosecution.  Ultimately, at the hands of **NETFLIX**, the Plaintiffs unwarrantedly solidify a global finance role as poster children for money laundering and tax evasion, with a logo that **NETFLIX** transforms into one that is synonymous with the same.

Plaintiffs are entitled to injunctive relief preventing **NETFLIX** from defaming the Plaintiffs, or any of them, and disparaging and misusing their protected logo(s) for economic gain. The Plaintiff, therefore, prays that a narrowly tailored Temporary Restraining order be issued forthwith, and without the necessity of Plaintiffs posting a bond.  The Plaintiffs also pray that the Temporary Restraining Order continue as against the Defendants, pending the outcome of a Preliminary Injunction hearing.

THE PLAINTIFFS,

BY _____

Stephan Seeger, Esq. (CT 19234)
Law Offices: Stephen J. Carriero
810 Bedford Street, Suite #3
Stamford, CT  06901
(203) 273-5170
(203) 357-0608
Seegerkid2@aol.com

## **ORDER**

The foregoing motion having been heard this      day of October, 2019, is hereby

granted/denied as follows:

_____

Hon. Judge/Clerk