UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MOSSACK FONSECA & CO., S.A, BUFETE MF & CO., JÜRGEN MOSSACK and RAMÓN FONSECA | : : : : : | CIVIL ACTION NO: 3:19-CV-01618 |
| Plaintiffs | : | **AMENDED COMPLAINT**: |
| v. | : : : : | |
| NETFLIX INC. | : | |
| Defendant | : | OCTOBER 17, 2019 |

## PRELIMINARY STATEMENT

Plaintiffs bring this action for damages and injunctive relief against Defendant Netflix for Defamation (Libel and Libel Per Se), False Light Invasion of Privacy, Trademark Infringement by Dilution, and Federal False Advertising.

In its movie "The Laundromat," the Defendant defames and portrays the Plaintiffs as ruthless uncaring lawyers who are involved in money laundering, tax evasion, bribery and/or other criminal conduct. Academy award winner Gary Oldman plays Plaintiff, **JÜRGEN MOSSACK**, whose real name is used in the film. Antonio Banderas plays Plaintiff, **RAMÓN FONSECA**, whose real name is also used in the film. In the movie's trailer, https://www.youtube.com/watch?v=wuBRcfe4bSo, the opening clips state the movie is "based on some real shit" and several screens appear asking the question "how do 15 million millionaires in 200 countries stay rich . . . [answer] with lawyers like these," followed by a screen shot of Oldman and Banderas laughing sinisterly, dressed in

flashy clothing. Throughout the trailer and movie Oldman and Banderas narrate as close-up bookends, faces to easily attribute criminal and negative innuendo.

Famous academy award winning actress Meryl Streep, playing recently widowed Ellen Martin who lost her beloved husband on a fall boat tour, pursues justice after being told by her lawyer that her de minimis settlement with the tour operator was related to a recent change in their insurer.  Essentially, their new offshore insurance company was defunct, if it ever existed, and Streep's lawyer states "so there is confusion over who has to pay."  The trailer, designed to attract future moviegoers and boost sales, follows this comment with Streep responding to the lawyer:  "so they drown you and 20 twenty other innocent people," while another background voice adds "and somebody's making money off it."  The dialogue spans clips of Streep mourning at a funeral, then reverting back to her lawyer's office where she is given her settlement check and told by her lawyer:  "and it all goes back to this law firm Mossack Fonseca."  In an immediately subsequent clip Oldman and Banderas, dressed in flamboyant gold colored suits and sporting bowties, smile and look at one another while elderly people appear to be playing table games at a flashy nightclub casino in the background.

The viewer quickly learns that **MOSSACK** and **FONSECA** are villains profiting from the death of 20 people killed in the small town boat tour, as the lawyer chimes in stating "they're getting away with murder."  The imputed criminal conduct is supplemented seconds later when the **FONSECA** character asks the audience:  "So how does it all work?"  In the immediately following clip depicting Streep and her daughter pushing a cart in a grocery store, the answer is provided as Streep exclaims:  "bribery, corruption, money laundering, millions and millions and millions of dollars," as the scene

pans away to clip showing a "download" of hacked "Panama papers" in progress at "508, 905" of "11, 528, 218." The files being downloaded are the notorious 11.5 million hacked documents imparted to a German reporter who enlisted the International Consortium of Investigative Journalists (ICIJ) to unleash the stolen data, worldwide, in articles and other media accounts of politicians, criminals, and other wealthy people using offshore companies to hide assets and launder money.

The "download" frames are followed by a statement echoing the message of the film: "somebody needs to sound the alarm," whereupon Banderas is bombarded with ringing and beeping of multiple phones. Immediately thereafter, other clips of people apparently connected to offshore accounts through the law firm of Mossack Fonseca exclaim "shit" and/or other expletives in different languages, including an English speaking lady at a bar, a gentlemen dressed in garb resembling a Sheik, two Russian gangsters, and the wife of a Chinese politician driving by some soldiers. The clear implication is that all of these people are associated with criminal activity, and they have been "outed" in the "hack and release" of the firm's client information. As the scene returns, it depicts Oldman and Banderas in a Board Room in front of a huge shot of the law firm's logo, which includes the names of Plaintiffs **MOSSACK** and **FONSECA**. The two actors are depicted with concerned "we've been outed" expressions. The implications and innuendo converge to cast Plaintiffs in the light of mastermind criminals whose crimes include, but are not limited to, murder, bribery, money laundering and/or corruption. Defendant's trailer and movie have clearly defamed the Plaintiffs and cast them in the false light of criminality.

In the course of the movie the Defendant also uses the Plaintiffs' already public, famous and/or notorious trademarked logo in disparaging ways.  The trailer and movie incorporate a trademarked logo which is registered in Colombia and protected under the 1929 General Inter-American Convention for Trade Mark and Commercial Protection, a self-executing Treaty, wherein both Colombia and the United States are member States, and wherein member states are authorized to pursue protection and infringement claims using the legal system in the member State of the offending party.

The Plaintiffs did not authorize, permit, assign, or license Defendant's use of their protected logos.  The Defendant's use and display of the logo in the "Laundromat," greatly diminishes and/or dilutes its value and goodwill.  Defendant's trailer and movie also utilize the logo unnecessarily, placing it in scenes that allow the viewer to associate it with very serious criminal and unethical behavior.  In doing so, the Defendant infringes upon the protected logos, disparaging and tarnishing the same for no necessary or colorable artistic purpose, or other constitutional benefit of expression.  The logo is used approximately 8 times between the trailer and the movie proper, exposed on the side of a building, on a client folder, twice behind a transparent door in an office, on a background re-broadcast of a CNN news segment, and three times in scene backgrounds projected on large screen televisions, including one instance lasting approximately 30 seconds.  Clearly, the Defendant uses the logo in its trailer to attract moviegoers and generate revenue, and in the movie to benefit economically from the reality the logo lends to its scenes.  Defendant's use is not incidental.  When viewing the logo placement in both the trailer and the movie, the viewer will assume that the Plaintiffs endorse and/or approve the use, however, the manner in which the logo is used would cause most viewers a

mental association that would be unsavory, damaging, and/or unwelcomed by the Plaintiff owners of the logo. Accordingly, the Defendant has diluted and falsely advertised the logo, all to the detriment of the Plaintiffs.

While the preview has been in the public domain for several weeks, the movie has been released in two limited public engagements to date at the Venice and Toronto film festivals. The movie's expected release date to a general public audience in theatres was September 27, 2019 and, thereafter, to millions of **NETFLIX** subscribers worldwide on or about October 18, 2019.

Notably, the anticipated release dates correspond with times during which the Plaintiffs will be defending criminal charges against them in Panama. Moreover, the charges against the Defendants were instituted notitia criminis - merely because the news and/or media alleged or implied that the Plaintiffs were engaged in criminal activity. The significance for this case is that new implications that arise in "The Laundromat," will likely precipitate Panamanian prosecutors to investigate any accusation or criminal implications revealed therein. Thus, while the Plaintiffs have no connection to Cartel murders or Russian gangster money laundering, an investigation into allegations made directly and/or via innuendo in the movie, may subject Plaintiffs to unnecessary and unwanted legal attention. Notably, the two current prosecutions have resulted in "country arrest" and bail, and both cases were precipitated by media accounts of "Panama Papers" allegations. With the release of the movie in Panama expected on October 18, 2019, and elsewhere even earlier, the Plaintiffs could be subjected to additional bail and/or conditions for each new crime imputed to them in the movie.

Additionally, since both **MOSSACK** and **FONSECA** are the subjects of an FBI Investigation in the Southern District of New York that could result in a Trial in the United States, the false "Big Screen" portrayal of their involvement in money laundering and/or other financial crimes poses an immediate threat and harm to the Plaintiffs' fair Trial rights here. The Libelous representations made about Plaintiffs' involvement in criminal and unethical behavior, stand (1) to affect current criminal proceedings against them in Panama, (2) precipitate additional criminal investigations in Panama, and (3) to pollute a potential jury pool in a U.S. criminal prosecution.

Ultimately, at the hands of the Defendant, the Plaintiffs unwarrantedly solidify a global finance role as poster children for money laundering and tax evasion, complete with a logo that the Defendant ensures will guarantee a mental association with crime and corruption. Accordingly, in addition to damages, the Plaintiffs seek injunctive relief preventing **NETFLIX** from defaming the Plaintiffs, or any of them, and disparaging and misusing their protected logo(s) for economic gain. Given the nature of the gravamen suffered, and the reputational and due process interests as stake, the Plaintiffs are subjected to immanent and immediate irreparable harm for which they should be entitled to injunctive relief.

## JURISDICTION

This Court has subject matter jurisdiction over this action: (1) under 28 U.S.C. § 1332, since there is diversity of citizenship between Plaintiffs and Defendant, and the amount in controversy (exclusive of interest and costs) exceeds the sum of seventy five thousand dollars ($75,000.00); (2) under 28 U.S.C. § 1331, since claims herein arise under the Constitution, laws and/or treaties of the United States, namely the Trademark

Act of 1946, as amended, 15 U.S.C. §§ 1051, et. seq. (the "Lanham Act") and/or the self-executing 1929 General Inter-American Convention for Trade Mark and Commercial Protection;  (3) under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051, et seq. (the "Lanham Act"), via the 1929 General Inter-American Convention for Trade Mark and Commercial Protection, a self-executing Treaty;  and (4) under 28 U.S.C. § 1367, for all state law claims pled herein, because those claims are joined with, and are so related to Plaintiffs' claims under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051, et. seq. (the "Lanham Act") over which this Court has original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.

## PERSONAL JURISDICTION FACTS-INFORMATION & BELIEF

This Court has in personam jurisdiction over the Defendant (hereinafter "NETFLIX") in this action since it is a registered as a foreign corporation authorized to conduct business in the State of Connecticut, and because Defendant regularly engages in business in this judicial district, advertising and marketing its streaming video products, selling subscriptions, and ultimately streaming programs into the State and the entire United States of America. **NETFLIX** streams its content into the State of Connecticut to subscribers in Connecticut.  These subscribers may sign up for a trial period or ultimately register for an account on their own computers or televisions located at homes in Connecticut.  Subscribers are offered different plans related to payment and length of membership, and prospective subscribers use credit cards in the State of Connecticut to pay for subscriptions, normally on a monthly basis.  This payment by Connecticut residents continues depending on the length of the subscription purchased before it becomes renewable;  the payment is requested in Connecticut and accepted in

Connecticut where would-be subscribers are located when they pay. The **NETFLIX** website is more than just a repository for advertising its content, or advertising in general, it is a functional part of the payment system their business model is based upon. Once paid, Membership is active and subscribers can watch and stream content into their Connecticut homes twenty-four (24) hours per day; the platform is in constant use and ready to supply the demands of Connecticut residents for various movie products including series, sports, movies, and/or documentaries.

Certain streamed content pertains to events that occur in Connecticut including sporting events, documentaries and even movies which have Connecticut connections; for example, "The Haunting in Connecticut," "The Haunting in Connecticut 2," "Connecticut Yankee in King Arthur's Court," "The Connecticut Poop Movie," "Christmas in Connecticut," "Connecticut Sting 2003; Under the Umbrella," "1999 NCAA Division I Men's Basketball National Championship Connecticut vs. Duke," "2004 NCAA Div. I Women's Basketball National Championship Tennessee vs. Connecticut." See Neflix.com (a search of the word "Connecticut" on the opening subscriber scene produces a list of the aforementioned content).

**NETLFIX** also advertises and solicits other business in the State of Connecticut, outside of but related to its steaming video platform. For example, it offers partnerships with Internet Service Providers ("ISPs"). See Openconnect.netflix.com where Netflix states:

> The goal of the Netflix Open Connect program is to provide our millions of
> Netflix subscribers the highest-quality viewing experience possible. We achieve
> this goal by partnering with Internet Service Providers (ISPs) to deliver our
> content more efficiently. We partner with hundreds of ISPs to localize substantial

amounts of traffic with Open Connect Appliance embedded deployments, and we have an open peering policy at our interconnection locations.

It is also involved in promotions with other Connecticut vendors who are present and conducting business in the State of Connecticut.  For example, promotional plans with T-Moblie where customers in Connecticut with two lines receive free subscriptions.  See e.g.,  https://www.t-mobile.com/offers/netflix-on-us (describing promotional deals).

**NETFLIX** has also produced, filmed and/or otherwise contracted vendors in the State of Connecticut to produce movie content in the State of Connecticut.  The Website of Survival Systems U.S.A., Inc., for example, states: "Are you in need of a production location with a high clarity deep water pool? Our pool was the first choice for a number of productions including a van crash scene for the Netflix Original "The OA." See https://www.survivalsystemsinc.com/production-location.html.  The Real Yellow Pages, at www.yellowpages.com, notes that in Connecticut there are "450 Netflix affiliates where you can purchase Netflix and Netflix gift cards."  Cox Communications in Connecticut allows residential customers in Connecticut to access Netflix and pay for their Netflix subscriptions using Cox Contour.  See https://locations.cox.com/ct.html.

NETFLIX has already released a preview of their movie "The Laundromat" to the general public, using Youtube and in doing so they were aware that it would reach its Connecticut subscribers.  The Youtube medium clearly illustrates that **NETFLIX** does not take steps to exclude Connecticut residents from viewing the trailer.  And while there is no current plan to release the movie "The Laundromat" in theatres, that is probably tied to its current performance and competition for venues.  Moreover, it is undeniable that a Connecticut audience is contemplated by **NETFLIX** in releasing the movie on its streaming platform.

**NETFLIX** purposely broadcasts its content into Connecticut for the purpose of making a profit.  It has a significant customer base to which it streams in Connecticut, and these customers are billed and have the obligation to pay, on an ongoing and continuous basis.  The contract between **NETFLIX** and its subscribers obligates its "streaming" performance in the State of Connecticut on an ongoing and continuous basis as well.   For those who have paid monthly or yearly subscription fees, **NETFLIX's** obligations to stream continues;  it would be hard to reconcile a position that under such circumstances, if **NETFIX** stopped streaming, or otherwise breached its contract by failing to perform, that thousands of people in the State of Connecticut would have no recourse without visiting California.  The nature of the business doesn't permit the reasonable expectation that Defendant would not be hailed into Court in Connecticut.  It has purposely broadcast a preview/trailer that reaches a Connecticut audience, for the purpose of advertising the content and attracting more subscribers.

Defendant not only has the requisite contacts with Connecticut, it also has precipitated harms directly in Connecticut; the trademark violation and the defamatory conduct "arise out of or relate to" the contacts. Netflix has and continues to publish a trailer and will publish the material that constitutes the alleged gravamen via its streaming platform beginning October 18, 2019. Thus, **NETFLIX** has already harmed the Plaintiffs in Connecticut with proactive conduct. The Defendant has caused the negative associations with the mark already in Connecticut, and libelous material has been released to people in Connecticut as a direct result of **NETFLIX's** publications. **NETFLIX** maintains servers and/or other equipment in Connecticut, and has and continues to employ people in the State of Connecticut, use Connecticut vendors and/or

contractors to perform work, and is a party to other contracts and affiliations in Connecticut related to its doing business in Connecticut.

**VENUE**

Venue is proper in the District of Connecticut under U.S.C. § 1391(b), in that claims and causes of action arise in and/or relate to this Jurisdiction.

**JURY DEMAND**

Plaintiff respectfully demands a Trial by Jury pursuant to Fed. R. Civ. P. 38(b).

**FIRST COUNT**
*(Libel - As to All Plaintiffs)*

1.  At all times material to this Complaint, Plaintiffs, **JÜRGEN MOSSACK** and **RAMÓN FONSECA,** were licensed attorneys practicing law, and residing in the Republic of Panama.

2.  At all times material to this Complaint, Plaintiff **BUFETE MF & CO. (**hereinafter **"MF"**) was a Panamanian law firm, organized as a partnership, wholly owned by its equal partners, Plaintiffs, **JÜRGEN MOSSACK** and **RAMÓN FONSECA**, and duly registered under the laws of the Republic of Panama, with a head office located at Edificio Mossfon, Segundo Piso, Calle 54 Este, Ciudad de Panama.

3.  At all times material to this Complaint, **MOSSACK FONSECA & CO, S.A. (**hereinafter "**MFSA**"), was a closely held Panamanian corporation duly formed and existing under the laws of the Republic of Panama, wholly owned by its two equal shareholders, Plaintiffs, **JÜRGEN MOSSACK** and **RAMÓN FONSECA**,

with a head office located at Edificio Mossfon, Segundo Piso, Calle 54 Este, Ciudad de Panama.

4.  The Defendant, **NETFLIX INC.** (hereinafter "**NETFLIX**"), is a diversified multinational media corporation duly formed and existing under the laws of the State of Delaware, conducting business throughout the world, including in Connecticut and the rest of the United States.

5.  Defendant **NETFLIX** operates and conducts business in the State of Connecticut, and is registered as a Foreign Corporation authorized to conduct business by the Connecticut Secretary of State, bearing Registration Number 0735070, listing its principle head office address as 100 Winchester Circle, Los Gatos, California.

6.  At all times material hereto, Plaintiffs, **JÜRGEN MOSSACK**, **RAMÓN FONSECA**, **MF** and/or **MFSA (**hereinafter referred to collectively as "**MFGROUP**")**,** jointly and/or individually, were primarily engaged in the business of forming and maintaining offshore companies (hereinafter "products") for clients, corporate and/or otherwise, including, but not limited to, banks, law firms, accountants and/or other institutional/professional clientele (hereinafter "original clients").

7.  **MFGROUP's** products were sold in Panama and other countries commonly referred to as "tax havens" where, until recently, corporate disclosures have been limited and tax treatment has been favorable.

8.  In the course of business, the Plaintiffs and/or any of them, did not counsel, advise and/or provide legal advice to ultimate end users (hereinafter "**UEUs**") to whom their products were sold by Plaintiffs' original clients.

9.  In the course of it business, **MFGROUP** developed and maintained its own compliance standards and procedures, and implemented and/or supplemented the same as required and/or prescribed by the laws of Panama and/or any other jurisdiction, within which any of its products were sold and/or maintained, including, but not limited to, due diligence requirements mandating **MFGROUP** to know and keep contemporary records identifying not only its original clients, but also **UEU's** when and where legally mandated to do so.

10.  In or around 2014, in an effort to keep up with evolving "transparency motivated" laws respecting due diligence, ongoing client and **UEU** data collection, and client/**UEU** information disclosure, **MFGROUP** spawned a dedicated "compliance arm" entity comprised of twenty or more employees located in El Salvador.

11.  **MFGROUP** has served its clients and the industry for over forty-two (42) years collectively, during which time it built a reputation of trust and professionalism, and during which time it became a well-known worldwide leader in the perfectly legal offshore corporate formation and maintenance industry.

12.  **MFGROUP** has generated significant profits organizing and selling offshore companies, and charging fees for related corporate services including, but not limited to, corporate record maintenance and/or annual filing and/or other compliance related services.

13. Likewise, **MFGROUP** has expended significant monies on client development, branding, and marketing its products worldwide via sponsorship, advertising, community activism, conferencing, charity and/or public service.

14. In an effort to develop its brand, **MFSA** caused logos to be registered in various jurisdictions including Panama, the European Union, and Colombia, the same having been used in commerce worldwide and having generated significant notoriety and fame.

15. In efforts to expand its brand, attract business, generate and maintain goodwill and value in its name, **MFSA** maintained and continues to enjoy the protections of its trademarked logos in Colombia, to wit:



duly registered with the Superintendencia Industria y Comercio, Republic of Colombia, including (1) Expediente No. 10-053693 – Certificado de Registro 412048, (2) Expediente No. 10-053705 – Certificado de Registro 412052, and (3) Expediente No. 10-053702 – Certificado de Registro 412051.

16. For the last several years, **MFSA** expended many thousands of dollars purchasing items bearing its logo, for use in **MFSA** branding and worldwide marketing/advertising of its products and services.

17. Likewise, at all times material to this Complaint, Plaintiffs **JÜRGEN MOSSACK** and **RAMÓN FONSECA,** invested significant time, energy, and funds, developing both their individual and corporate reputations.

18.  At all times material to this Complaint Plaintiffs, **JÜRGEN MOSSACK** and **RAMÓN FONSECA**, promoted their company products and contributed to the enhancement of the offshore industry by, inter alia, participating in forums, holding/sponsoring seminars, accepting speaking engagements, advising government officials, participating in charities, and maintaining membership in groups such as the Chamber of Commerce and Rotary Club.

19.  **MFGROUP's** involvement in community affairs, industry enhancement, charitable works, and government advisement, enhanced and elevated **MFGROUP's** reputation both locally and worldwide;  as lawyers and law firms, **MFGROUP** enjoyed healthy and stellar reputations.

20. At all times material hereto, **MFGROUP** sought to expand further into the industry and cultivate business opportunities throughout the world, using its brand and the group's collective reputations.

21.  In keeping with future plans of expansion in the industry, **MF** and/or **MFSA** entered into contracts with independent contractor representatives in many countries around the world (hereinafter "Representatives."), including, but not limited to the United Kingdom, Czech Republic, Switzerland, Peru, Ecuador, Brazil, Singapore, Cyprus, Israel, Dubai, Thailand, Guatemala, Chile, and the United States of America (Florida).

22. Representatives were independent contractors separate and apart from **MF** and/or **MFSA**, that were permitted exclusive rights to purchase and thereafter sell **MF** and/or **MFSA's** products and services, to newly acquired and/or existing

**MFGROUP** clients within specified jurisdictions in exchange for fees and/or specified commissions agreed to between the parties.

23. As part of the agreements, **MFGROUP** provided training and access to proprietary software systems, and Representatives were permitted to use variations of the **MFGROUP** names, along with **MFSA's** logos, in the course of conducting and developing business.

24. Notably, as part of such agreements, Representatives undertook and were contractually obligated to ensure legal compliance in their jurisdictions.

25. The profits made upon agreements with Representatives were significant.

26. Representatives utilizing the **MFGROUP** names and logo facilitated **MFGROUP's** branding efforts internationally, and enhanced its worldwide reputation.

27. Between selling its own products and services, and generating Representative based income, **MFGROUP** enjoyed significant profits.

28. In 2015, in what has been hailed but misnomered the largest "data leak" in history, an anonymous whistleblower hacked 11.5 million **MFGROUP** attorney-client privileged documents, and then sent the stolen documents to German journalist Bastian Obermayer at the Suddeutsche Zeitung.

29. The documents, commonly referred to as the "Panama Papers," partially and/or purportedly claimed to include information about many rich and famous people in both the private and public sectors, and made reference to over two-hundred-thousand (200,000) offshore entities created by Plaintiffs and/or any of them.

30. Due to the size of the post-hack revelations, and an inability to efficiently manage the data by himself, Obermayer enlisted the help of the International Consortium of Investigative Journalists (hereinafter "ICIJ").

31. Journalists from approximately 80 countries came together at Obermayer's behest and analyzed the hacked data for approximately one year, during which time the inner workings of **MF** and/or **MFSA**, along with a dearth of stolen, private and privileged documents were disseminated to the Consortium.

32. The "hack and release" confirms that only an extremely minute percentage of offshore corporations created by **MF** and/or **MFSA** appeared to have been utilized by some **UEUs** for criminal activity including, but not limited to, money laundering, tax evasion, bribery and/or fraud.

33. In or about April 2016, the first media accounts detailed the connections between Government officials and offshore holdings, as well as others involved in illegal activity, utilizing entities alleged to have been created by **MFGROUP**.

34. As a result of "hack and release" revelations, the Plaintiffs, or any of them, were rumored to have dealt directly with and/or advised, assisted or counseled heads of State and/or Government including, but not limited to, Russian President Vladimir Putin, the father of former Prime Minister of England David Cameron, former President of Ukraine Petro Poroshenko, former Iceland Prime Minister Sigmunder Davio Gunnlaugsson, former Pakistan Prime Minister Nawaz Sharif, and/or any of their relatives, agents, servants, employees and/or other representatives,

on the subject matter of tax avoidance, tax evasion, money laundering, fraud and/or other crimes.

35.  As a further result of "hack-and-release" revelations, the Plaintiffs, or any of them, were rumored to have dealt directly with and/or advised, assisted or counseled notorious drug Cartel and/or other Organized Crime leaders and/or any of their relatives, agents, servants, employees and/or other representatives, on the subject matter of tax evasion, money laundering, fraud and/or other crimes.

36.  As a further result of "hack and release," **MFGROUP**, or any of them, were rumored to have dealt directly with and/or advised, assisted or counseled international football/soccer notables such as Lionel Messi and/or FIFA executives such as its former President Gianni Infanti and/or any of their relatives, agents, servants, employees and/or other representatives, on the subject matter of tax evasion, money laundering and/or other crimes.

37.  The press and media generated by the Panama Papers hack, severely damaged **MFGROUP's** client relations and ongoing business prospects.

38.  Immediately after initial news reports of hack revelations, and the rumors concerning **MFGROUP's** alleged clients, banks and other third parties refused to do business with **MF** and/or **MFSA**.

39.  Immediately after the initial reports, and rumors concerning **MFGROUP's** alleged clients, Plaintiffs all faced bank account closures and to date, all remain unable to bank anywhere in the world.

40.  In spite of many clients' desire to continue working with **MFGROUP**, its inability to bank led to closure of its offices and ultimately the loss of its entire client base.

41.  As a result of investigations precipitated by the hack, **JÜRGEN MOSSACK** and **RAMÓN FONSECA** have been named as Defendants in legal proceedings in Panama by the Ministerio Publico-Fiscalia Auxilliar, to wit, one case commonly referred to as the "Lava Jato" case (Fiscal/Prosecutors File 06-2016, Court File Panama City  48931-19), and the second commonly referred to as the "Panama Papers" case (Fiscal/Prosecutors File 02-2016, Court File Panama City 87256-19 ).

42.  As a result of investigations and cases mentioned in paragraph forty-one (41) of this Complaint, **JÜRGEN MOSSACK** and **RAMÓN FONSECA** have been confined to the Republic of Panama, and are required to report to authorities twice a week as part of a bail order that also requires them to pay thousands of dollars to insurance companies who underwrite bail bonds to the Panamanian authorities.

43.  As a result of the "hack and release" investigations the Plaintiffs have been forced to hire attorneys, and have suffered damage to the goodwill and value of their businesses.

44.  Due to the investigations, AIG, an international insurance company, including its agents, assigns, successors, and/or other representatives, have refused to pay the Plaintiffs, or any of them, substantial monies (millions) to which they are entitled under multiple policies of insurance, citing the erroneous fact that the Plaintiffs, or any of them, were involved in money laundering and/or other financial crimes.

45. In spite of being the targets of two Panamanian cases for approximately four (4) years, no **MFGROUP** Plaintiff has ever been convicted of any charged crime.

46. In or about November of 2017, a Pulitzer Prize winning investigative journalist, Jake Bernstein (hereinafter "Bernstein"), wrote a book entitled "secrecy World" based upon the "Panama Papers."

47. Upon information and belief, Bernstein thoroughly researched the nature and origin of the Panama Papers hack, and was part of the original team of ICIJ journalists who reviewed the same.

48. Upon information and belief, and at all times material hereto, Bernstein knew that post-hack publications were comprised of stolen attorney-client privileged documents meant to remain confidential, and that only an extremely miniscule number of companies sold by Plaintiffs to original clients were connected to **UEU** criminal activity; ultimately, such **UEUs** were not **MFGROUP** clients.

49. Upon information and belief, Bernstein had a full opportunity to fact-check the substance of the Panama Papers material he used to write his book.

50. Upon information and belief, and at all times material to this Complaint, Bernstein knew and/or should have known that sensationalized rumors concerning **MFGROUP's** involvement in criminal activity with notorious clients, including those detailed in paragraphs thirty-four (34), thirty-five (35) and/or thirty-six (36) of this Complaint, were patently false.

51. Upon information and belief, at all times material hereto, Bernstein knew that **MFGROUP** sold corporate services and products such as corporations and

other legal entities to third parties, such as banks, lawyers, accountants and/or other professional institutions, and did not engage in advising any of its clients or **UEUs** on the subject matters of tax evasion or ways to launder money.

52. Upon information and belief, Bernstein wrote his book entitled "Secrecy World," for the purpose of making a profit.

53. Bernstein spoke on occasion with Plaintiffs **JÜRGEN MOSSACK** and **RAMÓN FONSECA**, however, neither of these Plaintiffs, nor any other duly authorized **MF and/or MFSA** representative, authorized him to use the Plaintiffs' names, likenesses and/or intellectual property in his book.

54. Bernstein's book defames the Plaintiffs, casts them in the false light of criminality, and contains unauthorized republications of **MFSA'**s logo.

55. In spite of having spoken to Bernstein, neither **JÜRGEN MOSSACK** nor **RAMÓN FONSECA** endorses Bernstein's book, its factual allegations and/or the conclusions drawn therein.

56. Neither **JÜRGEN MOSSACK** nor **RAMÓFONSECA,** have ever associated directly and/or indirectly with Bernstein, his book and/or any matter related thereto.

57. The subject matter of Bernstein's book is summarized on the front cover of the same, where Bernstein "takes us inside the world revealed by the Panama Papers, a landscape of illicit money, political corruption, and fraud on a global scale**,"** and purportedly introduces the reader to a "hidden circulatory system flowing beneath the surface of global finance, carrying trillions of dollars from drug trafficking, tax evasion, bribery, and other illegal enterprises . . . mask[ing] the identities of the

individuals who benefit from these activities, aided by bankers, lawyers, and auditors who get paid to look the other way."

58. Upon information and belief, Bernstein sought to capitalize on his book, using claims that he personally spoke to **JÜRGEN MOSSACK** and **RAMÓN FONSECA** and, therefore, these Plaintiffs endorsed and/or otherwise approved of the factual allegations and/or conclusions drawn in his book.

59. Upon information and belief, Bernstein approached **NETFLIX** and/or **NETFLIX** approached Bernstein, about the prospect of making a movie about the Panama Papers based upon Bernstein's book "Secrecy World."

60. Upon information and belief, sometime in 2017 or 2018, Bernstein and Defendant **NETFLIX** entered into a contract wherein the latter would produce and distribute an "A" grade movie called "The Laundromat" based upon "Secrecy World," and Bernstein would be paid in connection with the same.

61. Upon information and belief, at all times material hereto, Bernstein acted in concert and consulted with Defendant, **NETFLIX,** in relation to the production of the movie based on his book.

62. Upon information and belief, Bernstein represented to **NETFLIX**, that he had spoken with **JÜRGEN MOSSACK** and **RAMÓN FONSECA**, implying that these Plaintiffs directly and/or tacitly consented to Bernstein using their names, likenesses and/or photos depicting them and/or **MFSA's** protected logo.

63. Upon information and belief, **NETFLIX** permitted, authorized, and or licensed Bernstein's use of its movie title "The Laundromat," for Bernstein's book "Secrecy World."

64. Upon information and belief, **NETFLIX** knew or should have known that the new book name "The Laundromat," implied further that the book upon which its movie was based was all about money laundering.

65. Upon information and belief, **NETFLIX** knew or should have known that the name change, against the backdrop of the movie's cast of famous actors and actresses, including Meryl Streep, Gary Oldman and Antonio Banderas, would draw Bernstein's readership's attention and introduce them to its movie, against the backdrop of the new libelous book title ("The Laundromat"), and the false and libelous statements attributed to the Plaintiffs directly, impliedly and/or by innuendo, in the Defendant's movie "The Laundromat."

66. Bernstein changed the name of his book to "The Laundromat," and remarketed the same as renamed on Amazon, thereby aligning his book with the message, allegations, and other libelous characterizations of the Plaintiffs in **NETFLIX's** movie "The Laundromat."

67. The Amazon page where purchasers can buy the book reflects the book's updated title at https://www.amazon.com/Laundromat-Previously-published-SECRECY-WORLD/dp/1250754402, stating that the book is now "[t]he Inspiration for the Major Motion Picture from Director Steven Soderbergh, Starring Meryl Streep, Gary Oldman, and Antonio Banderas.

68. The movie-inspiring book is summarized on the Amazon page as follows:

In *The Laundromat*, two-time Pulitzer Prize–winning investigative reporter Jake Bernstein explores this shadow economy and how it evolved, drawing on millions of leaked documents from the files of the Panamanian law firm Mossack Fonseca—a trove now known as the Panama Papers—as well as other journalistic and government investigations. Bernstein shows how shell companies operate,

how they allow the superwealthy and celebrities to escape taxes, and how they provide cover for illicit activities on a massive scale by crime bosses and corrupt politicians across the globe.

Bernstein traveled to the Caribbean, Latin America, Europe, and within the United States to uncover how these strands fit together—who is involved, how they operate, and the real-world impact. He recounts how Mossack Fonseca was exposed and what lies ahead for the corporations, banks, law firms, individuals, and governments that are implicated.

69.  Would-be moviegoers reading the summary, boasting the names of a celebrity Director and famous actors apparently endorsing the book's name change to the "Laundromat," are drawn to the claim that Plaintiffs were "exposed" for providing "cover for illicit activities on a massive scale by crime bosses and corrupt politicians."

70.  Upon information and belief, Bernstein personally and/or through agents, servants, employees and/or other representatives of himself and/or **NETFLIX**, wrote or caused the writing of the Amazon summary, noting the book's name change and its connection with "The Laundromat" movie.

71.  Upon information and belief, **NETFLIX** endorsed and/or approved the book summary to generate hype about its upcoming movie "The Laundromat."

72.  **NETFLIX** based its movie "The Laundromat" on Bernstein's book, wherein the Plaintiffs, via implication and innuendo, are involved in illicit and criminal conduct with organized crime bosses and corrupt politicians.

73.  Based upon information and belief, Defendant **NETFLIX** authorized the book's name change, and approved Bernstein's Amazon advertisement using the names of Steven Soderbergh, Gary Oldman, and Antonio Banderas, along with the summary characterizing **MF** and/or **MFSA** as a criminal enterprise assisting the likes of crime bosses and corrupt politicians.

74. The claim that **MF** and/or **MFSA** arranged shell corporation "cover," or otherwise assisted or consulted with the likes of crime bosses and corrupt politicians, is patently false.

75. Upon information and belief, Bernstein and Defendant **NETFLIX** knew or ought to have known, that **MFGROUP** never assisted or consulted with crime bosses and/or corrupt politicians.

76. In spite of knowledge of its falsity, libelous nature and/or its propensity to place the Plaintiffs in a false criminal light, **NETFLIX** willfully authorized the book's name change and the use of the movie name, along with those of participating actors, and the summary on the Amazon web page where Bernstein sold his book.

77. Further, in order to attract moviegoers and increase potential profits, **NETFLIX** produced a movie preview and/or "trailer" which libels the Plaintiffs directly, indirectly and/or by innuendo.

78. The official **NETFLIX** trailer is posted on YouTube at https://www.youtube.com/watch?v=wuBRcfe4bSo.

79. In the trailer, Defendant **NETFLIX** portrays the Plaintiffs as ruthless, uncaring and unethical lawyers involved in money laundering, tax evasion and/or other criminal activities that benefit wealthy people and/or dangerous criminals.

80. Academy award winner Gary Oldman plays Plaintiff, **JÜRGEN MOSSACK**, whose real name is used in the film.

82. Antonio Banderas plays Plaintiff, **RAMÓN FONSECA**, whose real name is also used in the film.

83. The trailer begins at 14 through 22 seconds with several screen shots containing solely words, asking the question "how do 15 million millionaires in 200 countries stay rich . . . [answer] with lawyers like these," followed by a screen shot of Oldman and Banderas dressed in flashy clothing laughing sinisterly.

 

 



84. In the movie, famous academy award winning actress Meryl Streep, playing Ellen Martin, a recently widowed wife who lost her beloved husband on a fall boat tour, pursues justice after being told by her lawyer that a <u>de</u> <u>minimis</u> settlement with the tour operator was related to a recent change in the responsible tour operator's insurance company; essentially, the new offshore insurer was insolvent and/or non existent.

85.  Explaining the insurance news to Streep in the preview at 28 to 30 seconds, the lawyer states "so there is confusion over who has to pay."

86.  Streep, responding to the lawyer in the preview at 30 to 35 seconds, responds: "so they drown you and 20 twenty other innocent people," while another voice adds "and somebody's making money off it."

87.  The trailer dialogue between Streep and her lawyer spans clips of Streep mourning at a funeral, and when the clip reverts back to her lawyer's law office at 35 to 38 seconds, she is given the settlement check and told by him that:  "it all goes back to this law firm Mossack Fonseca."

 

88.  The trailer viewer quickly understands that **MOSSACK** and **FONSECA** are villains, profiting from the death of 20 people killed in the small town boat tour, as the lawyer states between 53 and 54 seconds "they (**MF** and/or **MFSA**) are getting away with murder."

89.  The criminal conduct imputed to **MF** and/or **MFSA**, is supplemented seconds later from 1:11 to 1:18 seconds of the trailer, when the **FONSECA** character asks the audience:  "So how does it all work," and while Streep and her daughter are pushing a cart in a grocery store, the answer is provided as Streep exclaims:  "bribery, corruption, money laundering, millions and millions and millions of dollars," while

another clip pans to a "download" of the hacked panama papers revealing its "progress" at "698, 285" of "11, 523, 218. "



90.   The "download" clip in the trailer purports to be the notorious 11.5 million hacked **MF** documents sent to a German reporter who enlisted the International Consortium of Investigative Journalists ("ICIJ") to unleash the stolen data worldwide, in articles and other media accounts of politicians, criminals, and other wealthy people using offshore companies to hide assets and launder money.

91.   The download scene in the preview is followed by a voice at 1:16 to 1:23 seconds stating that "somebody needs to sound the alarm," whereupon Banderas is bombarded with the ringing and beeping of multiple phones, as other clips of people apparently connected to offshore accounts and/or purported clients exclaim "shit" and/or other expletives in different languages, including (1) an English speaking lady at a bar, (2) a gentlemen dressed in garb resembling a Sheik, (3) two Russian gangsters, and (4) the wife of a Chinese politician with soldiers outside her car window.

92.   The final seconds of the trailer depict Oldman and Banderas in a Board Room in front of a huge flat screen television projecting a still screen shot of the **MF** logo which includes the names of Plaintiffs, **MOSSACK** and **FONSECA,** flanking a

symbol of the four corners of the world, as the two actors look at each other with

astonishment, bearing "we've been outed" expressions.



93. In the full movie, the main character's plot involving Ellen (played by

Meryl Streep) is one outlet for defaming the Plaintiff's via scenes juxtaposed to imply

criminality. For example:

> (a) at about 20 through 23 minutes into the movie, the **FONSECA** character says:
> "How does it all work these offshore companies? Your vision leads you to a
> place that deals in money. A bank, a big bank, probably in Europe, you find
> yourself sitting across from a wealth manager, financial advisor, a banker that lets
> out your fears . . . income tax, estate tax, inheritance tax, capital gains tax . . .
> [he] suggests you set up an offshore company where your assets will be safe from
> scrutiny, that's where we come in. We supply your shell company that holds your
> assets, you're not the company, even if the company is you. Confused yet . . . we
> give this entity a name . . . you don't need office space you don't employees . . .
> exists on paper only. What does this company make, what goods and services do
> they supply? Privacy. Its nothing more than an email address and a post office
> box in a country where the laws are favorable to your financial goals. Where do
> you find such country . . . [**MOSSACK** character]; usually in the middle of the
> ocean, maybe in the Seychelles . . .."

The movie then switches scenes to Ellen (Meryl Streep) in her lawyer's office where they

discuss her just being satisfied with the settlement she received due to not having

insurance proceeds, because of an offshore entity set up the way the **FONSECA**

character describes, in a location in the middle of the "ocean" like the **MOSSACK**

character suggests.  And then:

> (b) at about 25 through 26 minutes into the movie, David Schwimmer playing
> tour boat owner is sitting with a Federal Agent character, who explains to him that
> there never really was an insurance company that insured his company stating:
> "there was no Global Property Owner's Association . . . [and] no Monarch, never
> really was . . .  its just a scam that goes through Houston, the West Indies to
> Panama, to some bank to who knows where, looks like an 18 U.S.Code 1343 . . .
> Fraud.

Placed together with the statement "it all goes back to this law firm Mossack and

Fonseca," these scenes link **MFGROUP**, by implication, omission of material facts, and

innuendo, with the crimes at issue in Ellen's settlement situation, namely Fraud, Wire

Fraud and/or Conspiracy.

94.   The full movie "The Laundromat," contains a sub-plots, that including

one where a man is killed and buried unceremoniously by a Cartel group in relation to

money laundering activity impliedly shielded by a shell corporation created by **MF**

and/or **MFSA**.

95.   The movie also unfolds a sub-plot involving Russian gangsters

laundering money through the purchase of real property by shell corporations;  the same

characters are linked to **MF** and/or **MFSA** as clients in later scenes that depict the

Panama Papers download, followed by a quick scene flash to other purported

**MFGROUP** clients shouting expletives in different languages, as they discover the hack

has revealed their information.

96.   The movie unfolds another sub-plot depicting a wealthy African

businessman/politician whose infidelity with his daughter's roommate precipitates a

secrecy deal with his daughter, paid for by interests in an offshore company with a hefty

bank account.  When the daughter attempts to collect the money, she is met by Oldman in a **MF** and/or **MFSA** office whereupon she is told there is no money left for her to collect.

97.  The African businessman/politician scene links **JÜRGEN MOSSACK, MF and/or MFSA,** to the scam that was perpetrated upon her by her father, where corporate ownership can be undermined conveniently by the conduct of a puppet director and/or other representatives, who can easily move money from one shell corporation to another, in order to avoid legitimate creditors and/or shareholders from collecting or liquidating.

98.  Upon information and belief Defendant, **NETFLIX**, at all times material hereto, knew or ought to have known that the Cartel scenes, the Russian gangster scenes, the African Businessman scenes, and the juxtaposition of several main plot themes suggesting criminal Fraud (hereinafter "insurance fraud scenes"), would tend to defame **MFGROUP** by implication and innuendo, and portray them in a false light as criminals.

99.  Upon information and belief, **NETFLIX** knew or ought to have known that **MFGROUP** did not engage in transactions such as those depicted in the Cartel scenes, the Russian Gangster scenes, the insurance fraud scenes and/or the African businessman scenes, all of which depict and imply criminal and/or unethical transactions and **MFGROUP's** involvement and/or complicity therein.

100.  Upon information and belief, **NETFLIX** knew and/or should have known, that false statements, representations, implications, omissions of material fact and/or juxtaposition of key facts concealing the truth, directly, indirectly and/or via innuendo, imparting criminal conduct to **MFGROUP** rooted in the Cartel, Russian

gangster, insurance fraud and/or African businessman scenes, were and continue to be false.

101.   **NETFLIX** also willfully used **MFSA's** trademarked and/or protected logo in its movie "The Laundromat" and its trailer, without permission, license, assignment, and/or any other authority from **MFSA**.

102.   The **NETFLIX** trailer and movie utilize one or more of **MFSA's** trademarked logos that are registered in Colombia and protected under the 1929 General Inter-American Convention for Trade Mark and Commercial Protection, a self-executing Treaty wherein both Colombia and the United States are member States, and wherein member states are authorized to pursue protection and infringement claims using the legal system in the member State of the offending party.

103.   The logos are used approximately 8 times between **NETFLIX's** trailer and "The Laundromat" movie, to wit:

        a.  once exposed on the side of a building;
        b.  once on a client folder;
        c.  twice behind a transparent door in an office;
        d.  once on a background re-broadcast of a CNN news segment;
        e.  three times (once for 30 seconds) on background televisions.

104.   Further, in the course of the movie and its trailer, the Defendant also uses the Plaintiffs' already public, famous and/or notorious trademarked logos disparagingly.

105.   The Defendant's use and display of the logos in its movie "The Laundromat," greatly diminishes and/or dilutes their value and goodwill.

106. Defendant's movie and its trailer also utilize the logos disparagingly, placing them in scenes that allow viewers to associate the logos with serious criminal and unethical behavior.

107. **NETFLIX's** actions infringe upon the protected logos, disparaging and diluting the same for no necessary or colorable artistic purpose and/or constitutional benefit of expression.

108. **NETFLIX's** trailer and movie have generated reviews that further defame the Plaintiffs, and hold them in the false light of criminality.

109. The multitude of reviews are indicative of the manner in which viewers perceive **MFGROUP**, against the backdrop of **NETFLIX's** "The Laundromat," including a somewhat poor review by the BBC which, notwithstanding its artistic expectations, still attributes criminal conduct to **MFGROUP** stating, <u>inter</u> <u>alia</u>, that the movie is "a light larky skim over 'the subject,' that . . . might cause viewers tutting and chuckling over Mossack Fonseca's crimes and misdemeanours, [but] it won't have them rushing to the barricades. <u>See</u> <u>http://www.bbc.com/culture/story/20190902-film-review-venices-biggest-disappointment</u>.

110. Reviewing **NETFLIX's** movie "The Laundromat," Paste magazine writes:

> The founders of this establishment, Jürgen Mossack (Gary Oldman) and Ramón Fonseca (Antonio Banderas) are the architects of an underworld of secrecy and corruption, and if their flashy outfits, private jets and carefree demeanors are any indication, they thrive off those they scam without any guilt. <u>See</u> <u>https://www.pastemagazine.com/articles/2019/08/post-322.html</u>

111. Reviewing **NETFLIX's** movie "The Laundromat," Denofgeek writes:

The Panama Papers were the documents at the center of the largest data leak in corporate and government history. More than 11 million records were leaked about Panamanian law firm Mossack Fonseca, of Jürgen Mossack (Oldman) and Ramón Fonseca (Banderas), which allowed the wealthy to funnel money illegally in and around the world.  See https://www.denofgeek.com/us/movies/meryl-streep/273469/laundromat-steven-soderbergh-netflix.

112. Reviewing **NETFLIX's** movie "The Laundromat, mxdwn.com

writes:

The Laundromat is based on the book Secrecy World: Inside the Panama Papers Investigation of Illicit Money Networks and the Global Elite by Jake Bernstein, which tells the story of the documents known as the Panama Papers. The Papers, which were leaked in 2015, revealed how Panamanian law firm Mossack Fonseca illegally funneled money for the wealthy in Panama and worldwide.  See https://movies.mxdwn.com/news/meryl-streep-to-star-in-panama-papers-film-the-laundromat/.

113. Reviewing **NETFLIX's** movie "The Laundromat" Deadline.com

writes:

Pic centers around one of the largest money laundering schemes ever. The Panama Papers refers to the documents that linked money laundering to politicians and powerful higher-ups such as U.S. President Donald Trump. The documents came to light due to a whistleblower with knowledge of the Mossack Fonseca law firm. Schwimmer plays Matthew Quirk, an attorney who speaks on behalf of one of the insurance companies after 20 elderly passengers die on a boating excursion. The boating company learned its insurance isn't the large company it thought it was, but merely just a P.O. box in Nevis. Quirk commits suicide after seeing no way out of the liability situation, but the incident triggers lawyers, government officials, and more to track down these shell companies. Those investigations lead to the laundering geniuses at the Panama-based law firm Mossack Fonseca, who created hundreds of thousands of "companies" to help the wealthy avoid paying taxes. See https://deadline.com/2018/10/netflix-the-laundromat-robert-patrick-steven-soderbergh-1202486204/.

114.  Reviewing the **NETFLIX** movie "The Laundromat" IndieWire

writes:

The 11.5 millions documents showcased global tax evasion by thousands of companies registered with Mossack Fonseca, covering up an astounding list of criminal activities . . . "The Laundromat" grows far more intriguing when it settles into a series of overlapping dramas to illustrate the sheer international scale of Mossack Fonseca's corruption.  See https://www.indiewire.com/2019/09/the-laundromat-review-steven-soderbergh-1202170171/

115. Reviewing **NETFLIX's** movie "The Laundromat" The Guardian

web-page article states:

The Laundromat - "based on actual secrets" and adapted from a non-fiction book by Jake Bernstein - does a fine job in making a drama out of this financial crisis  . . . [b]ow your heads in remembrance of Mossack Fonseca, the best law firm you never heard of, the world's fourth largest provider of offshore financial services. For decades it operated quietly, diligently under the radar of public scrutiny, shepherding its anxious clients through a mystifying array of global tax evasion schemes until the release of the Panama Papers in 2016 metaphorically pissed on everyone's chips. Next thing you know, the office has been raided, its directors are in jail and the golden age is over, or at least under audit.

Mossack and Fonseca prize discretion above all things, except possibly money. Naturally, they would "prefer not to know" about the sometimes shady provenance of the clients on their books. The drug kingpins and sex traffickers. The traders in human organs. But happily Soderbergh has no such qualms. So he throws in the tale of a murder inside a business hotel and another about a philandering businessman who buys his daughter's silence with inflated share options. These case studies are presented with a twinkle of good humour. They play like jaunty little sitcoms but carry the distinct whiff of sulphur.  See https://www.theguardian.com/film/2019/sep/01/the-laundromat-review-gary-oldman-spins-lies-to-meryl-streep-in-sparkling-comedy?CMP=Share_AndroidApp_ProtonMail

116.  Reviewing **NETFLIX's** movie "The Laundromat" the widely read

"LA Times" website states:

Neither Bernstein's book nor Soderbergh's movie would exist without the 2015 leak of an enormous trove of documents from Mossack Fonseca, a Panamanian law firm whose money-laundering operations were found to have provided cover for all manner of criminal activities worldwide. In a movie with more than a few false aliases, it spoils nothing to point out that Banderas and Oldman are in fact playing the firm's chief partners, Ramón

Fonseca and Jürgen Mossack (which partly explains Oldman's comically exaggerated German accent). See https://www.latimes.com/entertainment-arts/movies/story/2019-09-25/the-laundromat-review-netflix-meryl-streep

117.  Reviewing **NETFLIX's** movie "The Laundromat" the influential "NY Times" website states:

> Ellen Martin, a Michigan grandmother whose attempts to do apparently straightforward things like settle an insurance claim and buy a new condo are ensnared in complicated schemes that defy rational comprehension. The companies she deals with are shells within shells, paper entities confected in the Mossack Fonseca offices, where accountability is laundered along with money. See https://www.nytimes.com/2019/09/25/movies/the-laundromat-review.html

118.  At all times material hereto **NETFLIX** was aware that movie critic reviews would follow the release of "The Laundromat," and with a cast including Streep, Oldman, and Banderas, along with reputed Director Steven Soderbergh, such reviews would draw the attention of media giant websites such as nytimes.com and/or latimes.com, and others who would publish and entrench libelous content into the internet worldwide.

119.  Upon information and belief, **NETFLIX** knew and/or ought to have known that its movie "The Laundromat" would generate reviews that would be libelous, and cast **MFGROUP** in a false criminal light, regardless of any reviewing purpose to rate the movie artistically and/or for box-office success.

120.  The false statements, implications, and innuendo that are contained in **NETFLIX's** movie "The Laundromat" and its trailer, do not constitute protected speech.

121. **NETFLIX** has already published false and libelous material to international audiences as well as movie reviewers, and intends to continue publication of the same after releasing "The Laundromat" in theatres in the United States on September 27, 2019, and to its millions of its streaming subscribers on or about October 18, 2019.

122. Upon information and belief, Defendants knew or should have known, that statements, representations, depictions, and resulting implications and innuendo contained in "The Laundromat" were false and did not accurately reflect real life events.

123. **NEXTLIX** intentionally, maliciously and/or in reckless disregard of the truth has and will continue to publish its movie in theatres and throughout the world.

124. At all material times Plaintiffs had, and continue to have, interests in protecting their personal and professional reputations for various purposes, including resurrecting their business in order to earn a living and/or defending themselves in the context of a fair Trial in present and/or anticipated criminal proceedings, including proceedings pursuant to any forthcoming Indictment in the Southern District of New York, where Plaintiffs deserve due process, a fair trial, and an "unpolluted" jury pool.

125. The false statements, misrepresentations, implications, omission of material facts and/or strategic juxtaposition of key facts to conceal the truth, directly, indirectly and/or by innuendo converge against **MFGROUP** in **NETLIX's** "The Laundromat," in a manner subjecting Plaintiffs to shame, scorn, ridicule, hatred,

mistrust, contempt, disgust and/or public opprobrium before a substantial number of community members.

126. As a direct and proximate result of the false and libelous representations made in "The Laundromat," members of the public have been led to believe that Plaintiffs are individuals with aberrant personalities.

127. As a direct and proximate result of the false and libelous representations made in "The Laundromat," Plaintiffs' personal and professional reputations have been injured.

128. As a direct and proximate result of the false and libelous representations made in "The Laundromat," friends, relatives, professional acquaintances and clients have been deterred from associating with or dealing with the Plaintiffs either personally and/or professionally.

129. The acts of the Defendant, **NETFLIX,** in making false statements, misrepresentations, implications, omission of material facts and/or strategic juxtaposition of key facts to conceal the truth, directly, indirectly and/or by innuendo, constitute Libel as against all Plaintiffs.

130. The acts of the Defendant, **NETFLIX**, have caused immanent and/or immediate and irreparable harm to the Plaintiffs.

131. The acts of the Defendant cannot be remedied by money damages alone, and the Plaintiffs, **MFGROUP,** currently stand without adequate remedy at law to address the gravamen caused by **NETFLIX**.

132. The acts of the Defendant have caused injury to Plaintiffs, and they are entitled to damages and/or injunctive relief in connection with said injuries.

## SECOND COUNT
### *(Libel Per Se - As to All Defendants)*

1 to 128.  Paragraphs one (1) through one-hundred-and-twenty-eight (128) of **COUNT ONE**, are repeated and realleged as if the same were fully set forth in this **SECOND COUNT**.

129.  Defendant's false statements, misrepresentations, implications, omission of material facts and/or strategic juxtaposition of key facts to conceal the truth, directly, indirectly and/or by innuendo, constitute Libel per se, inasmuch as the same converge to accuse the Plaintiffs of committing crimes of moral turpitude and/or crimes punishable by imprisonment.

130.  The acts of the Defendant have caused immanent and/or immediate irreparable harm to the Plaintiffs.

131.  The acts of the Defendant **NETFLIX** cannot be remedied by money damages alone and Plaintiffs, **MFGROUP**, stand without adequate remedy at law to address the gravamen caused by **NETFLIX**.

132.  The acts of the Defendant have caused injury to Plaintiffs, and they are entitled to damages and/or injunctive relief in connection with said injuries.


## THIRD COUNT
### (*False Light Privacy - As to All Defendants*)

1 to 128.  Paragraphs one (1) through one-hundred-and-twenty-eight (128) of the **FIRST COUNT**, are repeated and realleged here as if the same were fully set forth in this **THIRD COUNT.**

129. The aforementioned actions of Defendant were done intentionally, without lawful excuse, privilege, justification, or statutory authority, and/or under a void process.

130. The Defendant **NETFLIX** performed acts and engaged in conduct, against the Plaintiffs' will and without consent, constituting an invasion of Plaintiffs' privacy by placing them in a false light before the public, to wit, portraying them as unethical and ruthless lawyers guilty of money laundering, tax evasion and/or other criminal conduct.

131. At all times material to this Complaint, **NETFLIX** knew and continues to know of the falsity of its representations proper and/or via implication, omission of material facts and/or juxtaposition of key facts to conceal the truth, directly, indirectly, or via innuendo, yet the Defendant has and continues to act with reckless disregard for the truth, continuing intentionally and/or recklessly to cause Plaintiffs to be portrayed in a false light in the movie "The Laundromat."

132. At all times material to this Complaint, Plaintiffs had a reasonable expectation of privacy in not being placed before the public in a false light.

133. The aforementioned actions and/or omissions of the Defendant constitute a violation of Plaintiffs' reasonable expectations of privacy, and amount to conduct that would be highly offensive to a reasonable person of ordinary sensibility, constituting an actionable false light invasion of privacy as against the Plaintiffs.

134. As a direct and proximate result of the aforementioned representations made by **NETLIX**, Plaintiffs' reputations have and will continue to be severely damaged.

135. The acts of the Defendant have caused immanent and/or immediate and irreparable harm to the Plaintiffs.

136. The acts of the Defendant cannot be remedied by money damages alone, and Plaintiffs stand without adequate remedy at law to address the gravamen caused by **NETFLIX**.

137. The acts of the Defendant have caused injury to Plaintiffs, and they are entitled to damages and/or injunctive relief in connection with said injuries.

**FOURTH COUNT**
***(Trademark Dilution/Tarnishment under 15 U.S.C. 1125(c) – As to MFSA)***

1 to 128. Paragraphs one (1) through one-hundred-and-twenty-eight (126) of the **FIRST COUNT**, are repeated and realleged here as if the same were fully set forth in this **FOURTH COUNT.**

129. At all times material to this Complaint **MFSA** held a valid and trademarked logo registered in the country and members state of Colombia, which it validly maintained by complying with all of the domestic laws of said member state.

130. At all times material to this Complaint, **MFSA's** logo was used by **MFSA**, its agents, servants and/or Representatives, in business and commerce, in Colombia and world wide, in countries including, but not limited to, Panama, United Kingdom, Czech Republic, Switzerland, Peru, Ecuador, Brazil, Singapore, Cypress, Israel, Dubai, Thailand, Guatemala, Chile, and the United States of America.

131. At all times material hereto, **MFSA's** logos were widely recognized by consumers in Plaintiffs' industry and became famous well prior to **NETFLIX's** unlawful use of the logo.

132. At all times material to this Complaint, **NETFLIX** had actual and/or constructive knowledge of **MFSA's** ownership and/or use of the logo in commerce.

133. Defendant has used, is using, and has caused others to use **MFSA's** logos in commerce, in connection with the advertising, promotion, and sale of their products and services, to wit, using the logo in a movie trailer to advertise and/or promote **NETFLIX's** movie "The Laundromat" and, additionally, using the logo in said movie to sell tickets, passes, subscriptions, and/or any entry or access instrument permitting people to pay for and view said movie.

134. **NETFLIX's** use of **MFSA's** logo against a backdrop of allegations and/or innuendo that **MFSA** is involved in money laundering, tax evasions, corruption and/or other crimes, has precipitated an undesirable, unwholesome, unwelcomed and/or unsavory mental association with the logo.

135. **NETFLIX's** use of **MFSA's** logo against a backdrop of allegations and/or innuendo that **MFSA** is involved in money laundering, tax evasions, corruption and/or other crimes, places the logo in the false light of criminality, and in a degrading context, thereby harming and diminishing the logo's goodwill, utility, value, and business reputation.

136. By creating negative mental associations with **MFSA's** logo, and exposing the same in the false light of criminality, **NETFLIX's** actions have diminished the present and future value of the logo in commerce.

137. **NETFLIX's** use of **MFSA's** logo is likely to impair its distinctiveness by causing consumers to no longer associate the logo solely and exclusively with **MFSA.**

138. At all times material to this Complaint, **NETFLIX** had alternative means outside of **MFSA's** logo placement in its movie to achieve any necessary and/or desired commentary, speech and/or artistic message.

139. The logo is used significantly in the movie and promotional material, and upon information and belief, **NETFLIX** used and continues to use the logo for the sake of making its movie scenes true to reality in an effort to maximize viewer appreciation and thereby increase profits.

140. The acts of the Defendant have caused immanent and/or immediate and irreparable harm to the Plaintiffs.

141. The acts of the Defendant cannot be remedied by money damages alone, and Plaintiffs stand without adequate remedy at law to address the gravamen caused by **NETFLIX**.

142. The acts of the Defendant have caused injury to Plaintiffs, and they are entitled to damages and/or injunctive relief in connection with said injuries.

### FIFTH COUNT
*(**Federal False Advertising In Violation Of 15 U.S.C. § 1125**)*

1 to 128. Paragraphs one (1) through one-hundred-and-twenty-eight (128) of the **FIRST COUNT**, are repeated and realleged here as if the same were fully set forth in this **FIFTH COUNT.**

129. Defendant is distributing, has distributed, and has caused others to distribute, materials that misrepresent **NETFLIX's** use of **MFSA's** logo, as permissible use, authorized, licensed, assigned, sponsored and/or otherwise endorsed by **MFSA**, when in fact the same is patently false.

130. **NETFLIX's** false and/or misleading statements misrepresent the

nature, characteristics, and qualities of the Plaintiffs' products, services and/or commercial activities, and thereby deceived and are likely to continue to deceive the public in violation of 15 U.S.C. § 1125.

131. At all times material to the Complaint, **NETFLIX's** unlawful conduct was and continues to be knowing, willful, deliberate, and undertaken in bad faith, in that Defendants knew and/or ought to have known that at the time it made said statements and/or representations the same were false and/or misleading, and designed solely to increase "The Laundromat's" ticket and subscription sales, and otherwise enhance Defendant's revenues.

132. As a result of **NETFLIX's** unlawful conduct, **MFGROUP** and/or **MFSA** individually have suffered and are likely to continue to suffer damages, while Defendants have profited and/or have been unjustly enriched.

133. The acts of the Defendant have caused immanent and/or immediate and irreparable harm to the Plaintiffs.

134. The acts of the Defendant cannot be remedied by money damages alone, and Plaintiffs stand without adequate remedy at law to address the gravamen caused by **NETFLIX.**

135. The acts of the Defendant have caused injury to Plaintiffs, and they are entitled to damages and/or injunctive relief in connection with said injuries.

**WHEREFORE,** the Plaintiffs pray this Court grants:

1. Injunctive relief, including a Temporary Restraining Order, Preliminary Injunction and/or a Permanent Injunction

2. Compensatory Damages;

3. Compensatory Damages under 15 U.S.C. § 1117 ;

4. Enhanced or treble damages under 15 U.S.C. § 1117;

5. Attorneys' fees and costs under 15 U.S.C. § 1117;

6. An accounting of profits derived by Defendants under 15 U.S.C. § 1117;

7. The Costs of this Action;

8. Prejudgment and post-judgment interest;

9. That this Court permit the service of the Complaint, associated motion papers, and any Court order upon Defendants and their legal representatives by email and FedEx pursuant to Federal Rule of Civil Procedure 4(f)(3); and/or

10. Such other relief as this Honorable Court may deem just and proper.

THE PLAINTIFFS

MOSSACK FONSECA CO., S.A.
BUFFET MF & CO
JÜRGEN MOSSACK
RAMÓN FONSECA

BY:_____
Stephan Seeger, Esq. (19234)
Law Offices: Stephen J.Carriero
810 Bedford Street, Suite#3
Stamford, CT  06901
Tel:  (203) 273-5170
Fax:  (203) 357-0608
Seegerkid2@aol.com

## CERTIFICATE OF SERVICE

This is to certify that on October 17**,** 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____
Stephan E. Seeger